## In re ARKANSAS R. RATES.

(Circuit Court, E. D. Arkansas. September 3, 1908.)

1. CARRIERS—STATE REGULATION—REASONABLENESS OF RATES.

In determining the reasonableness of freight and passenger rates established by a state on intrastate traffic, as applied to railroads doing both interstate and intrastate business, the difference in the cost of handling each kind of business as related to the earnings from each should be taken into account, and a company is entitled to earn a fair percentage of profit from its intrastate business on the capital employed therein after deducting the portion of the total operating expenses properly chargeable thereto, without regard to its interstate earnings.

2. SAME—RESTRAINING ENFORCEMENT OF RATES—TEMPORARY INJUNCTION.

A court of equity may by a temporary injunction change the status quo where necessary to do so to avoid irreparable injury, and, where railroad companies have put into effect rates established by a state, and continued them in force for a sufficient length of time to determine their reasonableness, a court may properly grant a temporary injunction to restrain their further enforcement, if it is shown that they are unreasonable and confiscatory.

3. SAME.

A preliminary injunction granted to restrain the enforcement of rates established by the state of Arkansas on intrastate freight and passenger traffic handled by railroads on a showing that on actual trial for a reasonable length of time such rates have proven nonremunerative and confiscatory, depriving the complainant railroad companies of their property without just compensation, in violation of their constitutional rights.

In Equity. On motion for preliminary injunctions.

John M. Moore, for complainants.

William F. Kirby, Atty. Gen., George B. Rose, and Morris M. Cohn, for defendants.

VAN DEVANTER, Circuit Judge. The matter now under consideration is an application in each of four suits against the Railroad Commissioners of the state of Arkansas and others for a temporary injunction restraining the enforcement of the prescribed rates for the transportation of freight and passengers in intrastate commerce in that state; it being contended on the part of the complainants that these rates are unreasonable, noncompensatory, and therefore confiscatory. The matter was first brought on for hearing on July 28th last, when, at the request of the defendants, the hearing was post-

poned until August 31st that they might be better prepared to meet the contention of the complainants. On the latter date the parties appeared, and three days were consumed in the presentation of proofs and in the arguments of the counsel. Each of the four railroad companies is operating an interstate railroad, and is engaged in the transportation over such railroad of freight and passengers, both intrastate and interstate, in the state of Arkansas, and each has made a practical and extended application or test of the rates in question. The freight rates were prescribed by the Railroad Commissioners while acting under the state statutes, and the passenger rate, which is two cents per mile, was prescribed by statute. The proofs disclose the revenues actually derived by each railroad, upon the application of these rates, from its business in the state, the revenues from each class of traffic being stated so as to show separately the earnings from intrastate freight, interstate freight, intrastate passengers, and interstate passengers, and also disclose the value of the property employed by each road in the traffic within the state, the taxes paid thereon, the actual cost of conducting the freight traffic, and the actual cost of conducting the passenger traffic.

The first question for consideration is: How shall this cost be apportioned between the intrastate and interstate traffic? The proofs make it quite plain that the production of a given amount of revenue is attended with greater cost in intrastate business than in interstate business; and that this is a generally recognized fact is attested by the decisions in other cases where the reasons which make it so are fully stated. Chicago, etc., Co. v. Tompkins, 176 U. S. 167, 178, 20 Sup. Ct. 336, 44 L. Ed. 417; Minneapolis, etc., Co. v. Minnesota, 186 U. S. 257, 262, 22 Sup. Ct. 900, 46 L. Ed. 1151; Northern Pacific Ry. Co. v. Keyes (C. C.) 91 Fed. 51, 53. Here the additional cost is shown to be at least 100 per cent. in freight traffic and at least 15 per cent. in passenger traffic, and this is not more than what has been shown in other cases. Undoubtedly these differences furnish a standard by which to apportion the total cost between the traffic which is intrastate and that which is interstate. Other standards are suggested, but the proofs indicate that none of them is as satisfactory or accurate as is the difference in cost in its relation to the revenue. That standard must, therefore, be applied, and this may be done in this way, taking the freight and passenger traffic separately: Increase the intrastate earnings by the ascertained percentage representing the difference in cost, thereby ascertaining what would have been earned by the same actual expenditure in conducting the intrastate traffic, had it been attended with the same relative cost as the interstate traffic. Then add the intrastate earnings, as so increased, to the interstate earnings, thereby ascertaining what would have been earned by the actual expenditure in conducting both the intrastate and the interstate traffic, had the former been attended with the same relative cost as the latter. Then ascertain what proportion of this total represents the intrastate earnings, as so increased, and what proportion represents the interstate earnings, and then ascertain the corresponding proportions of the total cost of the intrastate and the interstate traffic. When this mode of apportionment is applied in these cases, the result shows

that the earnings of each road from its intrastate freight traffic is much less than the proportion of the operating expenses and taxes properly attributable to it, and that the earnings of two of them from intrastate passenger traffic is a little less than the proportion of the operating expenses and taxes properly attributable to it. As to the other two roads, the earnings from the traffic last named are somewhat in excess of the proper proportion of the operating expenses and taxes, but not enough so to yield a return of 1 per centum per annum upon that proportion of the value of the property rightly attributable to such traffic. So the conclusion necessarily follows that the rates in question, both freight and passenger, are noncompensatory and unreasonable, and that their enforcement, although not so intended, is nothing other than a using or taking of the property of these railroad companies without due compensation, which is confiscation. This the Constitution of the United States does not permit, for, as was said in Smyth v. Ames, 169 U. S. 466, 526, 18 Sup. Ct. 418, 42 L. Ed. 819:

"(1) A railroad corporation is a person within the meaning of the fourteenth amendment, declaring that no state shall deprive any person of property without due process of law, nor deny to any person within its jurisdiction the equal protection of the laws.

"(2) A state enactment, or regulations made under the authority of a state enactment, establishing rates for the transportation of persons or property by railroad that will not admit of the carrier earning such compensation as under all the circumstances is just to it and to the public, would deprive such carrier of its property without due process of law and deny to it the equal protection of the laws, and would therefore be repugnant to the fourteenth amendment of the Constitution of the United States.

"(3) While rates for the transportation of persons and property within the limits of a state are primarily for its determination, the question whether they are so unreasonably low as to deprive the carrier of its property without such compensation as the Constitution secures, and therefore without due process of law, cannot be so conclusively determined by the Legislature of the state or by regulations adopted under its authority that the matter may not become the subject of judicial inquiry."

It is pertinent in this connection to observe that in that case it was also said (page 541 of 169 U. S., page 432 of 18 Sup. Ct. [42 L. Ed. 819]):

"So far as rates of transportation are concerned, domestic business should not be made to bear the losses on interstate business, nor the latter the losses on domestic business. It is only rates for the transportation of persons and property between points within the state that the state can prescribe; and, when it undertakes to prescribe rates not to be exceeded by the carrier, it must do so with reference exclusively to what is just and reasonable, as between the carrier and the public, in respect of domestic business. The argument that a railroad line is an entirety, that its income goes into, and its expenses are provided for, out of a common fund, and that its capitalization is on its entire line, within and without the state, can have no application where the state is without authority over rates on the entire line, and can only deal with local rates and make such regulations as are necessary to give just compensation on local business."

But it is urged that a temporary injunction ought not to be granted because these railroads have heretofore applied and given effect to the rates in question; the contention being that a temporary injunction may be employed to preserve the status quo pending the suit, but not to change it. It may be conceded that such an injunction is generally

employed as stated, and that the courts are generally reluctant to employ it otherwise, but this does not mean that they may not or ought not to employ it otherwise, when the exigencies of the case justly require it; for, as has been often held, courts of equity are not thus limited in their powers, but may by a temporary injunction effect a change in the status quo, if it be necessary to do so, as here, to avoid irreparable injury from what is plainly a continuing wrong. In re Lennon, 166 U. S. 548, 556, 17 Sup. Ct. 658, 41 L. Ed. 1110; Chicago, etc., Co. v. Winnett. (C. C. A.) 162 Fed. 242, 249; Pokegama Co. v. Klamath Co. (C. C.) 86 Fed. 528, 533, 535. It would hardly do to say to a railroad company that, by resorting to the very best method of testing the adequacy of a prescribed rate—that is, by putting it into actual practice for a reasonable period—all right to a temporary injunction, which might otherwise exist, will be lost; and yet that would be the result if the narrow view of the use of such an injunction here contended for were to prevail. True, some of the rates in question have been in force substantially in their present form for a much longer time than was necessary to make a practical test of them, but enough of influence is accorded to this fact when it is made a reason for requiring stronger and more persuasive proof of inadequacy than otherwise would be required, and that influence has been accorded to it here.

A temporary injunction will be granted as prayed for, but it will be required, for the protection of shippers and passengers, that a proper bond be executed in the sum of $200,000 conditioned that during the continuance of the injunction the railroad company shall keep a correct account showing, as respects every carriage of freight or passengers, the difference between the tariff actually charged and what would have been charged had the restrained rates been applied, and showing the particular carriage in question, the stations between which it occurred, and the name of the person affected, such record to be kept and held subject to the further order of the court; and also conditioned that the excess charged, with lawful interest and damages, shall be returned in each instance to the party entitled thereto within a reasonable date to be fixed by the court, if it shall be eventually determined that the temporary injunction ought not to have been granted.