LOVE et al. v. ATCHISON, T. & S. F. RY. CO.

(Circuit Court of Appeals, Eighth Circuit. March 29, 1911.)

Nos. 3,333–3,335, 3,368, 3,369, 3,460, 3,461.

*(Syllabus by the Court.)*

**1.** CARRIERS (§ 18*)—CONSTITUTIONAL LAW (§ 280*)—TENTATIVE RAILROAD RATES—ORDERS OF STATE COMMISSION—INJUNCTION—DUE PROCESS OF LAW.

Railroad companies, that have been, are, or will be deprived of parts of their property devoted to the public use of transportation without just compensation during the continuance of the rate-making process by provisions of a state Constitution, or of a state law, or by orders of a state commission, prescribing tentative rates and putting them in effect during the rate-making process under severe penalties, may maintain suits for and obtain relief by injunction during the continuance of the rate-making process to the same extent that they may after the process is complete.

It is as much a violation of the fourteenth amendment to the Constitution to take the property of a railroad company without just compensation during the process of rate-making as it is after the completion of that process.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 18;* Constitutional Law, Dec. Dig. § 280.*]

**2.** CARRIERS (§§ 12, 18*)—INJUNCTION—PLEADING—RATES—EFFECT OF BODY OF RATES FIXED BY SERIES OF ORDERS SAME AS WHEN MADE BY ONE ORDER AND MAY BE PLEADED AND TRIED IN THE SAME WAY.

Where within 20 months by a provision of a state Constitution passenger fares were reduced 33⅓ per cent., and by a series of about a dozen orders of its Railroad Commission made at different times freight rates on about 40 per cent. of the intrastate freight business of the railroad companies were reduced about 40 per cent., a bill is not demurrable or defective which avers that the passenger rate prescribed is confiscatory and that the effect of the freight rates fixed is to take the property of the complainant without just compensation, although the bill contains no averment that each order, taken by itself, is confiscatory.

The necessary effect of a body of rates prescribed by a series of orders effective at different dates within a few months is the same as that of a single order prescribing all the rates at the same time, and it may be so pleaded and tried.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. §§ 12, 18.*]

**3.** CARRIERS (§ 12*)—CONFISCATORY STATE RATES—REVENUE BASIS FOR APPORTIONMENT OF VALUE AND DISTRIBUTION OF COMMON COST TO CLASSES OF BUSINESS APPROVED.

The apportionment on the revenue basis of the values of the Oklahoma properties of the railroad companies to their different classes of business, and the distribution on the same basis of the items of common cost between their interstate and their intrastate business, in order to ascertain the net returns they received and would receive from the challenged fares and rates, were sustained by the great weight of the evidence in this case, by reason, and by authority, and they are approved.

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 12.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

185 F.—21

4. INJUNCTION (§ 135*)—APPEAL AND ERROR (§ 954*)—INTERLOCUTORY INJUNCTIONS—DISCRETION OF TRIAL COURT—CLEAR PROOF OF ABUSE OF DISCRETION REQUISITE TO DISSOLVE.

·Granting or refusing a temporary injunction is intrusted to the discretion of the court of original jurisdiction, not to the discretion of the appellate court.

In the absence of errors of law, the action of the court of original jurisdiction must be sustained, unless there is clear proof of abuse of its discretion.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. § 304; Dec. Dig. § 135;* Appeal and Error, Cent. Dig. §§ 3818–3821; Dec. Dig. § 954.*]

5. INJUNCTION (§·136*)—WHEN ISSUED.

If the questions presented in a suit for an injunction are grave and difficult, and the injury to the moving party will be certain, great, and irreparable if the motion for the interlocutory injunction is denied and the final decision is in his favor, while if the decision is otherwise, and the injunction is granted, the inconvenience and loss to the opposing party will be inconsiderable. or probably may be indemnified by a bond, the injunction usually should be granted.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. §§ 305, 306; Dec. Dig.˙§ 136.*]

6. INJUNCTION (§ 21*)—CARRIERS (§ 18*)—RATES—TEST OF RATES NO DEFENSE AGAINST INJUNCTIONS—ACQUIESCENCE IN PAST INJURY NO DEFENSE TO INJUNCTION AGAINST CONTINUANCE.

The acquiescence of the victim of a continuing injury in its infliction in the past constitutes no defense against, or estoppel of his right to, an injunction against its future continuance.

The fact that the railroad companies tested the fare and the rates challenged by their actual operation for several months is no sound reason for denying the injunctions against the continued operation of this fare and these rates.

, [Ed. Note.—For other cases, see Injunction, Dec. Dig. § 21;* Carriers, Dec. Dig. § 18.*]

7. INJUNCTION (§ 5*)—CARRIERS (§ 18*)—RATES—COURT MAY RESTORE AND MAINTAIN STATUS WRONGFULLY DISTURBED BY.

Courts of equity have plenary power, and it is often their duty to issue mandatory injunctions to restore and then to maintain a condition of things that has been wrongfully disturbed or changed.

The Circuit Court was far within its power when it enjoined the continuous operation of the confiscatory fare and rates which had changed a lawful status in existence before they took effect.

[Ed. Note.—For other cases, see Injunction, Cent. Dig. § 4; Dec. Dig. § 5;* Carriers, Dec. Dig. § 18.*]

8. CARRIERS (§ 18*) — INJUNCTION — CONFISCATORY STATE RATES — EVIDENCE CONSIDERED AND INJUNCTIONS SUSTAINED.

The evidence, which is too voluminous for recital or review, was considered, and it is held:

That this evidence presents no proof of any abuse of discretion by the Circuit Court in issuing the injunctions, but sustains its findings that the challenged fare and rates are confiscatory, and its orders for the injunctions. ˎ

[Ed. Note.—For other cases, see Carriers, Dec. Dig. § 18.*]

Appeals from the Circuit Court of the United States for the Western District of Oklahoma.

Bills in equity by the Atchison, Topeka & Santa Fé Railway Company, by the Gulf, Colorado & Santa Fé Railway Company, by the

Missouri, Kansas & Texas Railway Company, by the Midland Valley Railroad Company, by the Kansas City Southern Railway Company, by the Chicago, Rock Island & Pacific Railway Company, and by the St. Louis & San Francisco Railroad Company against J. E. Love and others, members of the Corporation Commission of the State of Oklahoma, and others. From orders (174 Fed. 59; 177 Fed. 493) granting interlocutory injunctions, the defendants appeal. Affirmed.

F. N. Judson and Charles West, Atty. Gen. (John F. Green and George A. Henshaw, on the briefs), for appellants.

Frank Hagerman, Gardiner Lathrop, and S. T. Bledsoe (Clifford L. Jackson, C. G. Hornor, Joseph M. Bryson, Cottingham & Bledsoe, Robert Dunlap, T. J. Norton, Edgar A. De Meules, J. W. McLoud, S. W. Moore, C. O. Blake, R. A. Kleinschmidt, W. F. Evans, and J. G. Egan, on the briefs), for appellees.

Before SANBORN and ADAMS, Circuit Judges, and WILLIAM H. MUNGER, District Judge.

SANBORN, Circuit Judge. These are appeals from orders of the Circuit Court granting interlocutory injunctions which prohibit the appellants, the members of the Corporation Commission of Oklahoma and the Attorney General of that state, from enforcing a provision of its Constitution which reduced the maximum fares for passengers in Oklahoma from three cents to two cents per mile and from enforcing certain orders of the Commission which reduced about 40 per cent. the maximum freight rates in Oklahoma on from 40 to 50 per cent. of the intrastate freight business of the companies in that state. The injunctions were granted, after a full hearing and a careful consideration of the evidence and the arguments of the parties and upon considered opinions, by Hook, Circuit Judge. 174 Fed. 59; 177 Fed. 493. Many reasons are now urged why the orders granting these injunctions should be reversed.

Counsel for the appellants first invoke the decision of the Supreme Court in Prentis v. Atlantic Coast Line, 211 U. S. 210, 29 Sup. Ct. 67, 53 L. Ed. 150, and insist that these suits were prematurely brought. In that case the State Corporation Commission of Virginia made an order prescribing a maximum passenger rate of two cents per mile in that state. The Constitution of Virginia gave to the railroad companies an appeal from this order to the Supreme Court of Appeals of that state, and gave power to that court to supersede the order during the pendency of the appeal. The railroad companies took no appeal, but refused to obey the order, commenced suits in the federal court, and obtained temporary injunctions against its enforcement. The Supreme Court of the United States did not deny the jurisdiction of the United States Circuit Court, or its power to issue the injunctions, but held that the function of the Supreme Court of Appeals of Virginia on the appeal from the order of the Commission was legislative, and that, as the legislative process of fixing the rate was not complete until an appeal had been taken and had been determined, or until the time to take it had expired, the more courteous and orderly course of pro-

cedure would be for the companies to pursue their appeal to the Supreme Court of Appeals of Virginia before they sought relief from the national court. But the Supreme Court of the United States added:

"It seems to us that the bill should be retained for the present to await the result of the appeals, if the companies see fit to take them. If the appeals are dismissed, as brought too late, the companies will be entitled to decrees. If they are entertained, and the orders of the Commission affirmed, the bills may be dismissed without prejudice, and filed again."

The companies had not put the prescribed fare into effect in that case. The officers of the state had been restrained from compelling them to do so, and from imposing the penalties provided for their failure so to do, by the injunctions of the federal court. The Virginia appellate court was empowered to grant upon the taking of an appeal, and the Supreme Court might well presume that it would grant, a supersedeas from the order of the Commission pending the appeal, so that the fare prescribed in that case had not gone into effect, and probably would not go into operation until the Supreme Court of Appeals of Virginia should decide the issues to be presented by the appeals to it, and the opportunity subsequently should be given to the railroad companies to apply to the federal court in equity for relief. The effect of the decision in that case, therefore, was that where the reduced fares or rates prescribed had not taken effect, and probably would not take effect until a state appellate court could, on appeal from the order of the Commission, perform its legislative function of finally fixing them, it was proper that railroad companies should take the appeals, and delay their applications to the federal court for relief until the legislative issues presented by those appeals were decided, or it became reasonably certain in some other way, as by dismissal of the appeals, that the prescribed fares or rates would be put into operation.

The records before us present no such case. The passenger fare of two cents per mile was prescribed by section 37 of the Constitution of Oklahoma, which prohibited a higher rate. No escape from this fiat was given by appeal or by supersedeas, and the only intimation of possible relief from it through the rate-making officers of the state government is found in the proviso which the section contains to the effect that the Corporation Commission shall have the power to exempt any railroad company from the operation of the fare upon satisfactory proof that the company cannot earn a just compensation for its services to the public, unless it is permitted to charge more than two cents per mile for the transportation of passengers within the state. This proviso, however, grants no authority to the Commission to make fares, to fix a reasonable fare, or to determine the reasonableness of any fare fixed. It does not even give the Commission power to exempt a railroad company from the operation of the two-cent fare, unless that fare and all the other fares and rates of the company, taken together, are proved to its satisfaction to be confiscatory, and the exercise of this power is necessarily not a legislative, but a judicial, function. Its exercise requires the determination of the ques-

tion whether or not section 37 of the Constitution of the state is violative of the fourteenth amendment to the Constitution of the United States, and the jurisdiction to determine that question is granted by the Constitution and the laws of the United States to the federal courts, and no law or act of any state may deprive them of the power or relieve them of the duty to perform this function when those entitled to their decision properly invoke their action. Chicot County v. Sherwood, 148 U. S. 529, 13 Sup. Ct. 695, 37 L. Ed. 546; General Oil Co. v. Crain, 209 U. S. 211, 212, 28 Sup. Ct. 475, 52 L. Ed. 754; Barber Asphalt Paving Co. v. Morris, 66 C. C. A. 55, 59, 132 Fed. 945, 949, and cases there cited.

The result is that the legislative function of making this fare was complete when the state was admitted into the Union, and that was on November 16, 1907. No injunction against an enforcement of this passenger fare was granted to the Midland Valley Railroad Company, but the injunctions issued at the suits of the other companies forbade its enforcement. Upon the admission of the state into the Union these companies reduced their passenger fares from their former charge of three cents per mile to the two cents per mile prescribed, and thereafter obeyed the inhibition of a higher rate until they were relieved in the early part of 1909, by the injunctions here in question. None of them ever applied to the Corporation Commission for exemption from the operation of section 37, and from the time the passenger fare took effect the federal court had plenary power to discharge at any time the judicial function of determining whether or not the effect of the operation of this fare was to deprive the companies of any of their property without just compensation.

The Corporation Commission, at different dates during the years 1908 and 1909, made orders by which it prescribed maximum rates in Oklahoma on the average about 40 per cent. below the former rates on coal, lumber, petroleum, and petroleum products, grain and grain products, cement and other building materials, vegetables and canned goods, cotton and cotton seed, and numerous other articles, and the companies promptly put these rates into effect on the respective effective dates of the orders, and maintained them until they were relieved by the injunctions in the early part of 1910. The Constitution of Oklahoma empowers the Railroad Commission to fix and enforce reasonable and just rates for the transportation of freight (article 9, § 18), provides that any corporation that fails to obey any valid order of the Commission within a reasonable time may be fined by the Commission such sum, not exceeding $500, as it may deem proper for each day's failure so to do (section 19), that any corporation whose rates are affected by any order of the Commission may appeal therefrom to the Supreme Court of the state (section 20), and that, upon the granting of an appeal, a writ of supersedeas may be awarded by that court, suspending the operation of the order appealed from until the final disposition of the appeal, upon the filing of a suspension bond approved by the Commission, or, on appeal from the Commission, by the Supreme Court.

The railroad companies in the early part of 1909 appealed from the various orders of the Commission, and applied to the Supreme Court to supersede them and to suspend their operation during the pendency of the appeals, but their applications were denied. They requested the Corporation Commission to certify to the Supreme Court of Oklahoma for review the records relating to the orders, and to fix the terms and amounts of suspension bonds to be executed by them, and the Commission refused their requests. The Supreme Court issued writs of mandamus commanding the Commission to send up the records, but it persisted in its refusal to suspend the operation of or to supersede the orders of the Commission. After the reduced fare and the rates here in question had been tested by the companies by their actual operation for many months, and in the autumn of 1909, they exhibited their bills in these cases in the United States Circuit Court below, and prayed that the members of the Commission and the Attorney General might be prohibited from enforcing the section of the Constitution and the orders which prescribed them, because, as they alleged, the necessary effect of their operation was to deprive the companies of fair returns upon the values of their property in Oklahoma devoted to the public use of transportation, and to take their properties without just compensation, in violation of the fourteenth amendment to the Constitution. These allegations must be taken to be true in the determination of these preliminary questions, and when these injunctions were issued the bills presented this state of facts:

The officers of the state of Oklahoma were enforcing a state constitutional provision which had finally fixed a confiscatory passenger rate that had been in operation two years, and orders prescribing proposed future confiscatory freight rates which were not finally fixed by the Supreme Court of that state were and had been in actual operation for many months under the penalty of drastic fines for a failure to maintain them. The Commission and the Supreme Court had refused to supersede the orders or to suspend their operation pending the appeals from them. The provision fixing the maximum fare and these orders for many months had been and were continually taking, and, unless their enforcement was stayed, would continue to take, the properties of the companies without just compensation. The Supreme Court had held in Prentis v. Atlantic Coast Line, 211 U. S. 210, 29 Sup. Ct. 67, 53 L. Ed. 150, that where future proposed rates were made, but were not and probably would not be in operation until after allowable appeals from the order prescribing them could be taken and decided by the Supreme Court of Appeals of Virginia in the exercise of its legislative function of rate-making, the more courteous course was for the companies affected to take the appeals and delay their applications to the federal courts for relief until those appeals were decided or the rate-making process was otherwise concluded. But it never had held that citizens whose property had been and was continually being taken without just compensation, by the putting and maintaining in force under severe penalties of tentative confisca-

tory rates during the continuous process of rat-making, were thereby deprived of immediate and plenary relief in the national courts from such a patent violation of the fourteenth amendment to the Constitution. Such a holding would render citizens remediless in the federal courts for such a disregard of the Constitution as long as the process of rate-making should be continued, and that process might be continued indefinitely, nay forever.

The legislative function in rate-making looks to the future and determines what future rates shall be. But when rates, either tentative or final, have been put and are maintained in actual operation under penalty of severe fines, the question whether or not their effect is to take the property of the railroad companies affected thereby without just compensation is a judicial one, conditioned by past or present facts, and the national courts cannot be deprived of jurisdiction of it by the fact that the process of making the tentative rates is yet incomplete. It is as clear a violation of the Constitution, and one as promptly remediable in the national courts, to take the property of a railroad company without just compensation by the enforced operation of tentative rates during the process of their making as by the operation of final rates after that process is complete. Railroad companies that have been, are, or will be deprived of parts of their property devoted to the public use of transportation without just compensation during the continuance of the rate-making process by provisions of a state Constitution, or of a state law, or by orders of a state commission, prescribing tentative rates and putting them in effect during the rate-making process under severe penalties, may maintain suits for and obtain relief by injunction during the continuance of the rate-making process to the same extent that they may after the process is completed. These suits were not prematurely brought.

The railroad companies allege in their bills that, if their earnings from other state business be considered, they cannot, so long as they are required to maintain a passenger fare of two cents per mile, or the freight rates established by the special orders of the Commission, obtain a fair or reasonable return upon the values of their properties devoted to the public use of transportation in Oklahoma. Counsel concede that, if these freight rates were specified in a schedule prescribed by a single act or order, this averment would be sufficient. But they argue that it is defective, and that it renders the bills demurrable, because the rates were prescribed by about a dozen orders of the Commission, made at different dates, that are stated in the bills, between January 30, 1908, and July 22, 1909, and the bills contain no allegation that each of these orders, taken by itself, is confiscatory. In support of this contention they cite Minneapolis & St. Louis R. R. Co. v. Minnesota, 186 U. S. 257, 22 Sup. Ct. 900, 46 L. Ed. 1151, and Northern Pacific Ry. Co. v. State of North Dakota, 216 U. S. 579, 30 Sup. Ct. 423, 54 L. Ed. 624.

Each of these cases involves rates upon a single commodity, coal. The carriage of coal in either Minnesota or North Dakota was but a small part of the business of the Northern Pacific Company in these

states. In the first case the loss shown to have resulted from the reduction in the year ending June 30, 1899, was $1,409.72, while the freight earnings on the divisions of the road affected by the order of reduction were over $700,000 during that fiscal year. All that the Supreme Court decided in these cases was: (1) That proof that if the rates fixed for coal were applied to all freight the company would not earn sufficient to pay its operating expenses was not enough to establish the fact that the rates were confiscatory, because the rates upon other articles might be sufficiently above the cost of carrying them to enable the company to earn a fair return upon its property notwithstanding the low rates on coal; and (2) that the evidence in the cases was not sufficient to prove that the rates challenged had the effect to take the properties of the companies without just compensation. There is no ruling or intimation in either of the cases that a series of acts or orders made within 20 months, which together established a body of confiscatory rates, is not as unconstitutional and as remediable by injunction upon a single averment of its confiscatory effect as a schedule of such rates prescribed by a single act or order.

It is the necessary effect of an established body of rates, not the forms or terms or times of the orders that establish it, that determines whether or not it is confiscatory. The rates under consideration affected 40 per cent. of the intrastate freight business of the companies. The necessary effect of the orders establishing these rates is the same that a single act or order establishing them all at the same time would have had, and the bills were neither demurrable nor defective because they challenged the entire body of these rates, without any specific allegation that each one of them was confiscatory, by an averment that their unavoidable effect was to take the property of the companies devoted to the public use of transportation in Oklahoma without just compensation.

Each railroad company was entitled to a fair return upon the value of its property in Oklahoma devoted to the public use. What return it actually received, and what it would probably continue to receive, under the fare and the rates in question, was ascertainable only by finding what percentage of the value of its Oklahoma properties devoted to its intrastate passenger business in Oklahoma and what proportion of the value of its Oklahoma property devoted to its intrastate freight business in Oklahoma the respective net incomes from those classes of business were and would be. But the Oklahoma property of each of these companies was used in common to transport passengers and freight in both interstate commerce and intrastate commerce; hence it became necessary for the court below, after it had found the value of the Oklahoma property of each of the companies, to divide that value on the most equitable and available basis between its interstate business and its intrastate business and between its passenger business and its freight business, and complaint is made that it apportioned this value on the revenue basis—that, for example, it assigned to its intrastate business in Oklahoma such a proportion of the value of its Oklahoma property devoted to the public use of transportation as the gross earnings of its intrastate business in Oklahoma bore to

the gross earnings of all its business in Oklahoma. The only other basis of division that was available under the evidence in this case was the ton mile and passenger mile basis—to assign, for example, to each company's intrastate business in Oklahoma such a portion of the value of its property in that state as the aggregate ton miles and passenger miles in the intrastate business bore to the aggregate ton miles and passenger miles in all its business in that state; and the real issue between these bases, therefore, was whether the apportionment of the value of the property should be made on the basis of the value of the use of it, or on the basis of its use without regard to the value thereof.

The former method seems to be the more reasonable and equitable. Capitalization is founded on the worth of use, not on mere use alone. The value of property, of investment in every form, is measured by the value of its use, not by its use divorced from the value thereof. Railroad rates are founded primarily on the worth of the use of the railroad machine by the various classes of freight and by the passengers, and not on the amount of the use only. The rate for hauling a ton of merchandise of the first class one mile is not many times the rate for hauling a ton of merchandise of one of the lowest classes the same distance, because the former ton uses the railroad property many times as much as the latter, but because the use by the former is worth more than the use by the latter. There is no unit of measurement between ton miles and passenger miles. The ton mile and passenger mile basis gives no effect to the pregnant differences between classes of loads, or between the distances they are hauled. It is inapplicable to the assignment of values to the mail, express, and miscellaneous business. In fact there is no proportioning or measuring relation between the various uses of property and its value when no regard is given to the values of the uses. On the other hand, the values of the uses of property, which its gross earnings substantially represent, present a natural and logical basis for apportioning its value to these uses.

Cases may indeed be imagined, one of them was suggested by Mr. Justice Brewer in Chicago, Milwaukee & St. Paul Ry. Co. v. Tompkins, 176 U. S. 167, 176, 20 Sup. Ct. 336, 44 L. Ed. 417, and many others of a similar character have been presented in the briefs of counsel, in which the results obtained upon this basis from the particular facts assumed do not seem to be perfect. But no basis has been suggested that produces a perfect result. It may be that none exists that will produce such a result in all cases. But the facts that the ton mile and passenger mile basis has no common unit of measurement, that it excludes the effect of the differences in the classes of freight and in the distances it is hauled, which are reflected in the revenue basis, that there is no proportioning or measuring relation between the value of property and its uses divorced from their values, that the revenue basis appeals more persuasively to the reason than any other suggested, and has commended itself to the judgment of, and has been adopted generally by, the courts upon whom duties of apportionment of this nature have been imposed in like cases, have

convinced that the court below committed no error by its use. Ames v. Union Pacific Ry. Co. (C. C.) 64 Fed. 165, 179; Chicago, Milwaukee & St. Paul Ry. Co. v. Tompkins (C. C.) 90 Fed. 363, 370; St. Louis & S. F. R. R. Co. v. Hadley (C. C.) 168 Fed. 317, 348–352; Northern Pacific Ry. Co. v. Keyes (C. C.) 91 Fed. 47, 56, 57; In re Arkansas Railroad Rates (C. C.) 163 Fed. 141, 142.

In order to ascertain the net return from the intrastate passenger business and from the intrastate freight business of each of these companies, it was necessary for the Circuit Court to find and deduct from the gross earnings of each of these classes of business the cost of doing that particular class of business. There were many items of the cost of doing all the business of the company in Oklahoma that disclosed the class of business on account of which they were incurred, and these are called "allocated items." But there was a large percentage of the cost of doing all the business of each of the companies in Oklahoma, like the cost of the maintenance of way and structures, which was incurred for the common benefit of its interstate business and its intrastate business, and there is no method of dividing these items of common cost between these classes of business which is sure to be mathematically accurate. Many methods have been and still are suggested. The question was: Which was the most equitable, the most likely to produce a fair and just division? And upon this subject there was much testimony of many witnesses, whose long experience in the practical operation of railroads, exceptional opportunities for extensive observation, and peculiar knowledge qualified them to form and express opinions. The Circuit Court examined all this evidence, considered the arguments of counsel, and adopted the revenue basis, and assigned these items of common cost to the classes of business in proportion to the gross earnings of these respective classes.

Counsel now argue that there were other available methods, more likely to be fair and just, which they insist the court should have preferred. They now suggest (1) the ton mile and passenger mile basis; (2) the division of the items of common cost in the same proportion that the allocated items assigned themselves; (3) the subtraction of the aggregate of the items of common cost from the gross earnings of all the business, the division of the balance between the various classes of business according to their respective gross earnings, and the subtraction therefrom of the items respectively allocated to these classes. There is no basis of division that is free from objection and criticism. But the decisive preponderance of the evidence is that the revenue basis is the most likely to be just and fair. Much that has been said concerning the use of this basis for the apportionment of the value of the property is applicable to its employment for the division of items of common cost. No reasons for the use of either of the other bases that seem to us so cogent and persuasive as those given by Judge Hook at pages 498, 499, of 177 Fed., for his adoption of the revenue basis have been called to our attention or occur to us. The use of that basis is sustained by many decisions, and it cannot be held to be erroneous or mistaken. Ames v. Union Pacific R. R. Co. (C. C.) 64 Fed. 165; Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct.

418, 42 L. Ed. 819; Chicago, Milwaukee & St. P. Ry. Co. v. Tomp-kins, 176 U. S. 167, 20 Sup. Ct. 336, 44 L. Ed. 417; Northern Pacific Ry. Co. v. Keyes (C. C.) 91 Fed. 47; In re Arkansas Railroad Rates (C. C.) 163 Fed. 141; St. Louis & S. F. R. Co. v. Hadley (C. C.) 168 Fed. 317.

We come, then, to the facts of these cases; for a review of the record in the light of the arguments and briefs of counsel has disclosed no error of law in the method pursued, or in the opinion or decision of the Circuit Court. From a vast mass of conflicting evidence, which covers more than 1,200 printed pages, nearly 600 of which are filled with the examination and cross-examination of witnesses, the court found that the effect of the enforcement of the fare and rates in question was continually to take the properties of the companies from them without just compensation, and that it was its duty to enjoin the continuance of this taking during the pendency of this suit. Counsel for the defendants below insist that these injunctions should be dissolved, because this finding and the court's findings of the respective values of the Oklahoma properties of the companies, of the cost of the respective classes of business of each of them, of the net return derived therefrom, and of many of the other constituent facts which led up to the ultimate conclusion, are not sustained by the evidence.

But the granting or withholding of an interlocutory injunction rests in the sound judicial discretion of the court of original jurisdiction, and where, as in the case in hand, that court has not departed from the equitable principles established for its guidance, its orders may not be reversed by the appellate court, without clear proof that it has abused its discretion. High on Injunctions (4th Ed.) § 1696; Higginson v. Chicago, B. & Q. R. R. Co., 102 Fed. 197, 199, 42 C. C. A. 254, 256; Kerr v. City of New Orleans, 61 C. C. A. 450, 454, 126 Fed. 920, 924; Thompson v. Nelson, 18 C. C. A. 137, 138, 71 Fed. 339, 340; Societe Anonyme Du Filtre Chamberland Sys. Pasteur v. Allen, 33 C. C. A. 282. 285, 90 Fed. 815, 818; Murray v. Bender, 48 C. C. A. 555, 559, 109 Fed. 585, 589; U. S. Gramophone Co. v. Seaman, 51 C. C. A. 419, 423, 113 Fed. 745, 749.

An appeal from an order granting or refusing an interlocutory injunction does not invoke the judicial discretion of the appellate court. The question is not whether or not that court in the exercise of its discretion would make or would have made the order. It was to the discretion of the trial court, not to that of the appellate court, that the law intrusted the granting or refusing of these injunctions, and the only question here is: Does the proof clearly establish an abuse of that discretion? Massie v. Buck, 128 Fed. 27, 31, 62 C. C. A. 535.

The controlling reason for the existence of the judicial power to issue a temporary injunction is that the court may thereby prevent such a change in the relations and conditions of persons and property as may result in irremediable injury to some of the parties before their claims can be investigated and adjudicated. It is a familiar rule of equity jurisprudence that if the questions presented in a suit for an injunction are grave and difficult, and the injury to the moving party will be certain, great, and irreparable if the motion for the

interlocutory injunction is denied and the final decision is in his favor, while if the decision is otherwise, and the injunction is granted, the inconvenience and loss to the opposing party will be inconsiderable, or probably may be indemnified by a bond, the injunction usually should be granted. Allison v. Corson, 88 Fed. 581, 584, 32 C. C. A. 12; City of Newton v. Levis, 79 Fed. 715, 718, 25 C. C. A. 161, 163; Great Western Ry. Co. v. Birmingham & O. J. R. Co., 2 Phil. Ch. 597, 602; Glascott v. Lang, 3 Mylne & C. 451, 455; Shrewsbury & C. R. v. Shrewsbury & B. R. Co., 1 Sim. (N. S.) 410, 426; State v. Brailsford, 2 Dall. 402, 1 L. Ed. 433; Blount v. Societe Anonyme du Filtre, 6 U. S. App. 335, 3 C. C. A. 455, 53 Fed. 98; Dooley v. Hadden, 38 U. S. App. 651, 20 C. C. A. 494, 74 Fed. 429; Jenson v. Norton, 29 U. S. App. 121, 12 C. C. A. 608, 64 Fed. 662.

But counsel argue (1) that this rule applies only to cases in which the purpose and effect of the injunctions are to maintain the status quo, and these injunctions were issued to change it; (2) that the companies acquiesced in the fare and the rates, and thereby, and by the fact that new industries have grown up in reliance upon them, they are estopped from enjoining them; and (3) that there was no emergency requiring the issue of the injunctions. These arguments are material only on the assumption that the fare and the rates were confiscatory; for, if they were reasonable and just, all concede that no injunctions should have issued. If they were confiscatory, and injunctions had issued against the enforcement of the constitutional provision and the orders which prescribed them before they went into effect, upon such opinion evidence as could then have been produced, they would have fallen under and would have been sustained by the established rule, which has been cited. A fortiori, should they be sustained now, when their issue is based on the more certain and convincing evidence of the necessary effect of the actual operation of this fare and these rates during a trial of about two years.

Again, the operation of the fare and rates was a continuing unconstitutional taking of the property of the companies from the time they were put into effect until their enforcement was enjoined. The companies' obedience to the provision of the Oklahoma Constitution and to the orders that installed the rates was under protest, under the penalty of drastic fines for a failure to obey, and was fully justified by their situation and the wisdom of an actual test and operation of the fare and the rates, in order certainly to determine and clearly to prove their effect. And even acquiescence in past continuing injuries does not estop their victim from enjoining their future continuance. One may not escape an injunction against his cutting the remainder of the trees on his neighbor's lands, because the latter acquiesced in his cutting a part of them, nor an injunction against his future infringement of his neighbor's patent, because he has long infringed it with impunity, nor an injunction against his continuing trespass upon his neighbor's land, because he has long trespassed without rebuke. Attorney General v. Eastlake, 11 Hare, 205; McLean v. Fleming, 96 U. S. 245, 247, 258, 24 L. Ed. 828; Menendez v. Holt, 128 U. S. 514, 523, 524, 9 Sup. Ct. 143, 32 L. Ed. 526; United States

Freehold Ld. & Emigration Co. v. Gallegos, 89 Fed. 769, 773, 32 C. C. A. 470, 474; Layton Pure Food Co. v. Church & Dwight Co. (C. C. A.) 182 Fed. 35, 41.

Moreover, in truth, the purpose and effect of these injunctions were to restore and maintain the status which existed before the unconstitutional acts of the people and the officers of Oklahoma disturbed that status, and thereby to prevent the irreparable injury which the companies must otherwise have suffered during the pendency of these suits. Plenary power is conferred, and the undoubted duty is imposed, upon a court of equity to issue its injunction for such a purpose. Toledo, A. A. & N. M. Ry. Co. v. Pennsylvania Co., 54 Fed. 730, 741, 742, 19 L. R. A. 387; In re Lennon, 166 U. S. 548, 556, 17 Sup. Ct. 658, 41 L. Ed. 1110; Buskirk v. King, 72 Fed. 22, 25, 18 C. C. A. 418; Pokegama S. P. Lumber Co. v. Klamath River & Imp. Co. (C. C.) 86 Fed. 528, 533, 535, 538; In re Arkansas Railroad Rates (C. C.) 163 Fed. 141, 143, 144. The protests of the companies against the fare and the rates and the fourteenth amendment to the Constitution constitute ample notice to the officers of the state and to the owners of the new industries that sprung up along the railroads that they could not acquire any right to continuous confiscatory fares and rates by the acquiescence of the companies in a test of their actual operation. The companies were not estopped thereby from obtaining the injunctions (Southern Pac. Co. v. Interstate Commerce Co., 219 U. S. 433, 31 Sup. Ct. 288, 291–294, 55 L. Ed. ——), and no greater emergency than the daily and continual taking of some part of their properties without just compensation during the long time that experience has demonstrated to be necessary to press one of these rate cases to final decree was required to justify the issue of the injunctions.

The single question remains: Does the evidence clearly show that the court below was guilty of an abuse of its discretion in its finding that the necessary effect of this fare and these rates was to deprive the companies of a fair return upon the values of their respective properties in Oklahoma? This question must be answered in the negative. No good purpose would be served by an attempt to recite or review the voluminous testimony upon the various issues which lead up to this conclusion. Suffice it to say that this court is unanimous in its opinion that the record in this case, not only fails to prove any abuse of discretion by the court below in the issuance of these injunctions, but sustains its findings that the fare and rates in question are confiscatory and its orders for the issue of the injunctions.

Those orders must be affirmed; and it is so ordered.