ON MOTION OF THE PLAINTIFF FOR A PRELIMINARY INJUNCTION
LUHRING, J.
It appears from the bill that on the 9th day of February, 1932, The Washington Post Company entered into a contract with the Tribune Company, whereby it was agreed that for a period of five years beginning on the 14th day of February, 1933, the Tribune Company would furnish each week to the Post Company in proof or matrix form, and the Post Company would accept and regularly publish certain newspaper features, referred to as “The Gumps,” “Gasoline Alley,” “Winnie Winkle” and so forth, for a stated weekly rate which the Post Company agreed to pay on or before the 15th of the month following the service.
The Post Company also agreed not to use, or cause or allow to be used any feature or features furnished to it, except for one publication of each item thereof in its said newspaper, *102 “nor will it give or sell to any person, firm or corporation any of the matter furnished to it ... or any rights of any nature therein without first obtaining in each instance the written consent of the Publisher (Tribune Company).”
It was further agreed that the Post Company would not publish any of the matter in advance of the respective release dates therefor set by the Tribune Company.
It is alleged that in entering into said contract, it was understood and intended by the parties that the features embraced therein would be furnished solely to The Washington Post and to no other newspaper in the city of Washington during the term of the contract; and that it is the custom and practice in the newspaper publishing business and in the business of selling syndicated material that such material when agreed to be sold to a newspaper, shall not be furnished or supplied to any other newspaper in the same city.
On the 25th day of March, 1933, one Benjamin S. Minor was duly appointed by this court receiver of all the property of The Washington Post Company, and, pursuant to decree entered on the 17th day of May, 1933, directing the sale of all of the assets and property of such company, including the newspaper known as “The Washington Post,” said receiver sold said property on the 1st day of June, 1933. The sale was ratified and confirmed by this court on the 12th day of June, 1933, whereupon the receiver transferred, conveyed and assigned all of such property and the name, The Washington Post, to the plaintiff herein, and by separate assignment on the 14th day of June, 1933, expressly assigned the contract above mentioned to the plaintiff.
The bill charges that the defendant herein, The Washington Times Company, had knowledge of the existence of this contract and the rights of The Washington Post thereunder, and had in the past sought to take away the features embraced in said contract from the Post. The bill further charges that in the month of June, 1933, “the defendant *103 wrongfully, knowingly, willingly and maliciously, and with intent to deprive the plaintiff of said features and to acquire the same for its own use, induced, persuaded and procured said Tribune Company ... to repudiate the contract . . . and to refuse to furnish to The Washington Post said features, and induced, persuaded and procured said Tribune Company ... to enter into an exclusive contract with the defendant whereby said Tribune Company . . . agreed to furnish said features to the defendant . . . and to no other newspaper in the city of Washington.” It is alleged that the plaintiff was notified that commencing on July 15th, 1933, the features embraced in the contract of February 9th, 1932, would be furnished to the defendant.
The prayer of the bill is that the defendant be enjoined and restrained from inducing, persuading and procuring the Tribune Company to repudiate, violate or breach this contract, and from accepting, printing or publishing in its newspapers, the Washington Times and the Washington Herald, during the term of the contract, the features embraced therein.
The answer controverts and denies the material allegations of the bill.
A temporary restraining order without notice was issued by this court on the 12th day of June, 1933, restraining the defendant from publishing any of the features embraced in the contract of February 9th, 1932, but which, on motion of the defendant, was dissolved June 14th, 1933.
The matter is now before the court on the motion of the plaintiff for a temporary injunction. Affidavits in support of and in opposition to this motion have been filed by the parties, and extensive argument was heard by the court on the 19th and 20th days of July, 1933.
A mere casual reading of the bill and its exhibits discloses that a serious and difficult question of law is involved with respect to the assignability of the contract of February 9th, 1932. The question of laches is also suggested. These ques *104 tions were earnestly discussed by able counsel in their arguments for and against the awarding of the preliminary injunction, and many authorities pro and con were presented for the consideration of the court. The defendant contended that the contract was one involving personal service and the relation of trust and confidence, and, therefore, was not assignable by the receiver so as to vest any right in the plaintiff. On the contrary, counsel for plaintiff argued with equal sincerity that this contract was not within the exception, and, therefore, was assignable. So also with respect to the defense of laches. The defendant urged that the plaintiff was guilty of such laches as barred its right to relief. The plaintiff vigorously urged that it had been diligent, and was not guilty of laches.
Since the oral argument, counsel for the plaintiff have furnished the court with a copy of the opinion of Schmuck, J., in the case of The Washington Post Publishing Company v: Tribune Company, et al., in the Supreme Court of the State of New York, for the County of New York, wherein it was held that the very contract involved here was assignable, and that by the assignment, the plaintiff here acquired all the rights of the Post Company. This decision is not binding upon this court, but is of most persuasive influence.
A final decision of this controversy will most likely require a determination of all legal questions presented. Certainly the arguments and briefs leave no doubt that counsel consider them of the utmost importance.
A material question of fact is involved in the charge and its denial that the defendant induced the Tribune Company to commit a breach of this contract. The affidavits make it plain that a real dispute exists over this material question, and, it is equally plain that the right of the plaintiff to maintain this suit depends upon the finding that the breach of the contract was in fact induced by the defendant.
This dispute can not be satisfactorily resolved upon the present affidavits, and, yet, it must be resolved, because it is *105 the foundation upon which the claim of the plaintiff rests. Upon a final hearing, the oral testimony of these affiants may be heard subject to cross-examination, when the court may determine the credibility of these witnesses and the weight to be given to their testimony.
In the case of Ohio Oil Co. v. Conway, 279 U. S. 813, the Supreme Court in a Per Curiam opinion said:
“Where the questions presented by an application for an interlocutory injunction are grave, and the injury to the moving party will be certain and irreparable if the application be denied and the final decree be in his favor, while if the injunction be granted the injury to opposing party, even if the final decree be in his favor, will be inconsiderable, or may be adequately indemnified by a bond, the injunction usually will be granted. Love v. Atchison, Topeka and Santa Fe R. Co., 185 Fed. 321, 331-332.”
See, also, Harriman v. Northern Securities Co., 132 Fed. 464, and the cases there cited and reviewed.
The rule thus laid down is applicable here. The features embraced in the contract had been published by the newspaper, The Washington Post, continuously and for a long time prior to its acquisition by the plaintiff. These features were exclusive to that paper and were not published by any other newspaper in the city of Washington. During all of the time these features appeared in The Washington Post they did not appear in any of the newspapers published by the defendant here. It is not only a matter of common knowledge, but it sufficiently appears from the bill and the affidavits, that untold numbers of newspaper readers select their newspaper because of these features, and it is quite proper to say that The Washington Post numbers among its readers those who are concerned with the doings and antics of the Gumps and Winnie Winkle. Perhaps these features alone hold these readers and induce them to purchase the paper. If deprived of these features or compelled to share their publication with *106 a rival and competing newspaper, it is impossible to measure the damage which would be sustained by the Post on that account. On the other hand, the defendant, during all of this time, did not number among its readers those followers of Gump and Winnie Winkle, and, therefore, will lose no such reader or subscriber. The defendant can sustain no loss in that respect even though the temporary injunction is granted and it should prevail upon final hearing. But if the injunction is denied, the injury to the plaintiff will be certain and irreparable.
The defendant, in its answer, alleges that it has been put to an expense in excess of five thousand dollars in advertising that the features embraced in the contract will be published in its newspaper, The Washington Herald. Recovery of this expense by the defendant in the event it prevails upon final hearing can be assured by adequate bond.
Therefore, under the rule announced in Ohio Oil Co. v. Conway, supra, the court is of the opinion that a preliminary injunction should issue upon the condition that the plaintiff give bond in the sum of Ten Thousand Dollars.
It. is so ordered.
BAILEY, J.
I do not think that the contract between the old Post Company and the Tribune Company was assignable. The agreement was in effect a license to the Post Company to publish certain copyrighted matter, and the furnishing of the matrices or plates was merely incidental to the license to publish. It was held in Stevens v. Gladding, 58 U. S. 447, that the right to print and publish is not necessarily annexed to the plates. “Neither is the plate the principal thing, and the right to publish an incident or accessory thereof. It might be more plausibly said that the plate is an incident or accessory of the right; because the sold object of the existence of *107 the plate is as a means to exercise and enjoy the right to print and publish.”
And of course the granting of the right to publish the Pegler and Dr. Evans articles are clearly merely licenses.
As a general rule a license to publish copyrighted matter is not assignable. The owner of the copyright has the right to determine the character and responsibility of the publisher, and it has been held that it is not assignable by one corporation to a new corporation even though the officers and stockholders of the two corporations are the same. Wooster v. Crane, 73 N. J. Eq. 22. I think that it could hardly be contended that this license could have been assigned by the old Post Company to the Evening Star Company, for instance, or to a newspaper publisher in Baltimore or Richmond.
But even if this contract should not constitute merely a license, and should be treated as an agreement to furnish merchandise on credit, I think the case of Arkansas Company v. Belden Mining Company, 127 U. S. 379, is controlling, and I cannot agree with the cases holding that the assignee of such a contract may make it assignable by offering to change its terms and make it a cash transaction. In such case the assignee could, by failing to make the cash payments, put the seller to great inconvenience and damage before he could make arrangements to sell to others.
This is a tort action. The bill alleges that in June, 1933, the defendant “wrongfully, knowingly, willingly and maliciously, and with the intent to deprive the plaintiff of said features and to acquire the same for its own use, induced, persuaded and procured” the Tribune Company to repudiate its contract with the old Post Company and to enter into an exclusive contract to furnish these features to the defendant.
To establish this tort it is necessary for the plaintiff to show that there was an existing contract between itself and the Tribune Company and that the defendant, knowing this contract to exist and to be in force, induced the breaking of *108 this contract for its own advantage. Apart from any question of assignability it is doubtful whether the contract had not been abrogated. Soon after his appointment the receiver wrote to the Tribune Company stating that “without adopting or renouncing” this contract he desired to have the Tribune Company to continue the service furnished by it to the Post, the arrangement to continue during the period of the receivership or until further notice. The Tribune Company complied with this request. Two days after the Receiver’s sale he wrote to the Tribune Company:
“I believe that it is the intention of the purchaser to continue your service and that such purchaser will most likely desire to enter into a contract with you with respect thereto within a reasonable time.”
Mr. Crawford, the representative of the Tribune Company, was unable to ascertain the name of the real purchaser. The receiver told him over the telephone that the lawyer for the purchaser told him that “he thought they would continue using your feature, but I do not know whether he has any authority to do so.”
Later the receiver wrote “I think that the new purchaser should be given a reasonable time within which to make arrangements to continue your service.”
The nominal purchaser at the Receiver’s sale, when asked by the receiver if his client desired the continuation of the performance of the contract, said:
“The publication of the paper will be continued and I expected that they would want the features under the contract, but they would not be in a position to answer such question until the sale was confirmed to them.”
Thus, between the time of the sale and of its confirmation by the Court, the Tribune Company had no assurance that the purchaser would elect to continue the contract. Whether, in a suit for specific performance brought by the *109 plaintiff against the Tribune Company, the Tribune Company could defend upon the ground that it had the right to treat the contract as terminated, is not the question in this suit, to which the Tribune Company is not a party; the question here is whether the defendant, through its agents, knew that the contract was still in force and so knowing induced the Tribune Company to break its contract with the plaintiff. I do not think that the evidence shows this. Although the representative of the defendant undoubtedly wished to obtain for it the benefits of this contract, I do not find the requisite knowledge on her part that the contract was still in force. Mr. Crawford had been advised by his counsel that the contract was not assignable and that he could treat it as terminated. So that this essential element of the tort was lacking, that is the inducing of the breach of the contract with knowledge of its existence. In view of this finding it is unnecessary to determine who was the moving party in the making of the new contract, a question on which the evidence is quite conflicting.
I am of the opinion therefore that the original contract was not assignable, that even if it were, and conceding that the rights of the Post Company under it passed to the new Post Company, the proof fails to show that the defendant induced the Tribune Company to breach its contract for the benefit of the defendant, with knowledge on the part of the latter that the .contract was then in force.
The bill will be dismissed with costs.