MISSOURI, K. & T. RY. CO. v. LOVE et al.  ATCHISON, T. & S. F. RY. CO. v. SAME.  GULF, C. & S. F. RY. CO. v. SAME.

(Circuit Court, W. D. Oklahoma. February 14, 1910.)

Nos. 471, 472, and 473.

1. CARRIERS (§ 12*)—RATES—REGULATIONS—REASONABLENESS.

Whether railroad rates prescribed by a state commission are reasonable involves a determination of the value of the property devoted to the public use to which the rates apply, the measure of a reasonable return on that value, and whether the rates allowed to be charged are sufficient to that end.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 19; Dec. Dig. § 12.*]

2. CARRIERS (§ 12*)—RATES—REGULATION.

Rates should be just both to the public and to the owner of the railroad (Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819); but if a railroad is not ill conceived, greater in extent than it should be, or unduly expensive in construction, and is operated wisely and economically, rates producing no more than a reasonable return on its fair value would not be unjust to any one.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 7–20; Dec. Dig. § 12.*]

3. CARRIERS (§ 12*)—RATES—REGULATION.

A railroad company, under the Constitution, cannot be lawfully denied a reasonable return on its property devoted to public use; and if, by the scope of its operations, several sovereignties are interested, the special insistence of the officers of one should not be permitted to cast an undue burden on the others. The factors common to all, affecting the reasonableness of rates, should be equitably dealt with and adjusted; and this, though the local rates of a single state are alone in question.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 19; Dec. Dig. § 12.*]

4. CARRIERS (§ 12*) — INTRASTATE RATES — REASONABLENESS — VALUATION OF RAILROAD PROPERTY.

In the case of a railroad system extending into or through two or more states, the part within a state, the value of which is to be determined upon an issue as to the reasonableness of rates therein, should be regarded in its relation to the whole, and consideration given to the influence upon

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

that value of property outside the state employed in aid of all its transportation business.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 19; Dec. Dig. § 12.*]

5. CARRIERS (§ 12*)—STATE RATES—REASONABLENESS—VALUE OF ROAD—DETERMINATION.

In a case involving the reasonableness of transportation rates, the revenue rule followed, in apportioning and assigning the value of the railroad in a state to its various kinds of business, and also in distributing the common expense of conducting the interstate and intrastate business therein.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. § 19; Dec. Dig. § 12.*]

Bills by the Missouri, Kansas & Texas Railway Company, by the Atchison, Topeka & Santa Fé Railway Company, and by the Gulf, Colorado & Santa Fé Railway Company against J. E. Love and others. On application for a temporary injunction. Granted.

See, also, 174 Fed. 59.

Clifford L. Jackson, C. G. Hornor, Joseph M. Bryson and James Hagerman, for complainant Missouri, K. & T. Ry. Co.

Cottingham & Bledsoe, Gardiner Lathrop, Robert Dunlap, and T. J. Norton, for complainants Atchison, T. & S. F. Ry. Co. and Gulf, C. & S. F. Ry. Co.

Frank Hagerman, for all complainants.

Charles West, Atty. Gen., Geo. A. Henshaw, Asst. Atty. Gen., Frederick N. Judson and Robert L. Owen, for defendants.

HOOK, Circuit Judge. These are suits by railroad companies to enjoin the enforcement of the passenger rate of two cents per mile prescribed by the Constitution of Oklahoma and certain freight rates prescribed by the Corporation Commission of that state. The suits were brought in September, 1909, after an experience of about 2 years with the passenger rate and from 9 to 18 months with the freight rates save some unimportant modifications; and it is claimed by the railroad companies the rates have proved so unreasonably low their continued enforcement will confiscate their property and deprive them of the equal protection of the law. In November, 1909, defendants' pleas in abatement were overruled (174 Fed. 59), and the applications of the railroad companies for temporary injunctions were postponed to afford defendants time for preparation. More than two months have been given for that purpose. At the recent hearing of the applications defendants presented exceptions and demurrers to the bills of complaint. They will be referred to presently. Whether rates prescribed by a state are reasonable involves a determination of the value of the property devoted to the public use to which the rates apply, the measure of a reasonable return on that value, and whether the rates allowed to be charged are sufficient to that end. The regulation of commerce among the states having been intrusted to Congress, and being therefore beyond the control of the state, difficult problems arise when the rates involved are those of a railroad com-

pany, for it generally happens, as here, that its property, whether entirely within the state or not, is employed commonly and inseparably in both interstate and local transportation; both kinds of traffic are moved in the same trains, over the same road and with the aid of the same employés. Again, it is generally the case, as here, that the railroad is but part of a larger system extending into or through other states, and there are factors of value, revenue, and expense which, though without the state, have such relation to and effect upon those within that they must be regarded in reaching a just conclusion. The extent and varied character of the property comprised in a railroad system make it difficult to ascertain its value, and objections may be made to all rules for apportioning the value and the revenues and expenses of operation to meet the issues in particular cases. Mathematical precision in matters so complex and of so many elements is not to be expected, but a court whose jurisdiction is invoked is not for that reason relieved of its duty to get as near an accurate result as the proofs permit. C., M. & St. P. Ry. v. Tompkins, 176 U. S. 167, 178, 20 Sup. Ct. 336, 44 L. Ed. 417. Uniform rules in such cases may not be exact, but when they answer to the great majority of right calls and distances they may be followed with reasonable assurance of a just conclusion. When the railroad is part of a greater system operated in other states as well, the ascertainment of its value within the state, and of such of its revenues and expenses therein as are incident to interstate commerce for purpose of ultimate separation from those pertaining to its commerce purely local to the state, should proceed with due regard not merely to the rights of the parties present, but also to those of the other states and to the province of Congress under the national Constitution. Every state in which a railroad system is operated is interested that justice be done, and it is not infrequently the case that commerce among several states, not subject to local regulation, is in volume at least the dominant feature of the railroad operations. It must always be remembered that under the Constitution a railroad company cannot lawfully be denied a reasonable return upon its property devoted to public use, and if by the scope of its operations several sovereignties are interested, the special insistence of the officers of one should not be allowed to cast an undue burden on the others. The factors common to all of them affecting the reasonableness of rates should be equitably dealt with and adjusted, though the local rates of a single state are alone in question.

In logical order there should first be found the value of the company's entire railroad property devoted to public use within the state, upon which, from all its operations therein, it is entitled to reasonable returns. Mr. Justice Harlan, in Smyth v. Ames, 169 U. S. 466, 546–547, 18 Sup. Ct. 418, 434, 42 L. Ed. 819, said:

"We hold, however, that the basis of all calculations as to the reasonableness of rates to be charged by a corporation maintaining a highway under legislative sanction must be the fair value of the property being used by it for the convenience of the public. And in order to ascertain that value, the original cost of construction, the amount expended in permanent improvements, the amount and market value of its bonds and stock, the present as compared with the original cost of construction, the probable earning capacity of the property under particular rates prescribed by statute, and the sum required to meet

operating expenses, are all matters for consideration, and are to be given such weight as may be just and right in each case. We do not say that there may not be other matters to be regarded in estimating the value of the property."

There is a tendency to deny the amount and value of outstanding stocks and bonds as evidences of value. Wholly aside from any consideration of the rights of investors in good faith or of the general consensus of public opinion as exhibited in a normal market for the securities, such evidences imply a recognition of the effect upon local value of influences without the state. A company may have, elsewhere, property of great value employed in aid of all its transportation business. Distant connections with important commercial centers, an outlet to tidewater and the like may affect favorably the worth of every mile of road in the system. It is general knowledge that there is an important element of value in a railroad as a whole which the part within the state, solely and separately regarded, does not possess. While the question ultimately is the value of the road within the state, the influence upon that value of things external is to be considered; and in the common judgment of men it is to some extent reflected in the amount and value of the stocks and bonds resting upon the system. Nor can it properly be said that such influence affects only the value for the interstate business of the company with which the state is not concerned in making local rates. There is too intimate a relation between commerce within the state and that among the states, and too much interdependence in their mutual growth and prosperity. A railroad system is essentially a unit and is generally so regarded. For instance, the part within the state may be assessed for local taxation at its value as an organic portion of a larger whole. C. B. & Q. R. Co. v. Babcock, 204 U. S. 585, 598, 27 Sup. Ct. 326, 51 L. Ed. 636; Western Union Tel. Co. v. Gottlieb, 190 U. S. 412, 23 Sup. Ct. 730, 47 L. Ed. 1116; A., T. & S. F. R. Co. v. Sullivan (C. C. A.) 173 Fed. 456. A value of a railroad in a state for local taxation would seem also to be there when rates of transportation are fixed. The assessed value and the acknowledged basis upon which the assessment is made express the judgment of public officers charged with the duty of investigation under the forms of the law and should receive due consideration. There is another matter to be regarded, not specifically mentioned in the above excerpt from the opinion of Mr. Justice Harlan. An established railroad system may be worth more than its original cost and more than the mere cost of its physical reproduction. It has passed the initial period of little or no return to its owners which, of greater or less duration, almost always follows construction and is not infrequently marked by default and bankruptcy. The inevitable errors in its building which finite minds and hands cannot avoid have been measurably corrected, time and effort have produced a commercial adjustment between it and the country it was intended to serve, relations have been established with patrons, and sources of traffic have been opened up and made tributary. In other words, the railroad, unlike one newly constructed, is fully equipped and is doing business as a going concern. It has attained a position after many experiences common to railroad enter-

prises which entail loss and cost not paid from current earnings, and which correspondingly make for value.

When the railroad within the state is used in both interstate and local commerce it is necessary next to determine what part of its value should fairly be considered as devoted to each use separately, because obviously the company should not exact such excessive rates for local traffic as will also produce a return upon a value employed in a business over which the state has no control. Neither class of traffic, interstate or local, should be made to bear a burden caused by paring the rates on the other to the quick. It is generally agreed that, given the entire value of the railroad property in the state, it is fair to apportion it among the different kinds or classes of business upon a revenue basis, that is to say, in proportion to the gross revenue produced by them respectively. And a like rule applies when the questions involved require separate consideration of the freight and passenger business. In this way will be found the fair proportion of value devoted to each particular use, upon which the owner is entitled for such use to a reasonable return. Counsel for defendants object to this method of assigning values, and the observations of Mr. Justice Brewer in the Tompkins Case, 176 U. S. 175–177, 20 Sup. Ct. 336, 44 L. Ed. 417, are quoted to show its inaccuracy under stated conditions. But it seems to have been adopted by him previously in the Nebraska case (Ames v. Union Pac. Ry. Co. [C. C.] 64 Fed. 165, 179, affirmed in Smyth v. Ames, supra) and by the courts generally in subsequent cases. Moreover, it is not perceived that the ton-mile basis advocated in its place is free from similar criticism. The number of tons hauled one mile has no bearing upon the value of the property employed save as revenue is produced, and when that element is recognized we are at once at the revenue basis. The ton mile could not be used in the necessary assignment of values as to mail, express, and miscellaneous services, nor as between passenger and freight traffic. Passengers are not transported by weight, and the passenger mile and the ton mile as units of measurement cannot be reduced to a common term. In these cases, therefore, the total value of the railroad property in Oklahoma of each complaining company, viewed in all its aspects, should be apportioned according to the rule mentioned, and assigned separately to interstate and local business, to freight and passenger business, and to mail, express and miscellaneous business, so the effect of the contested rates may be ascertained.

It is not difficult to ascertain from the records of a railroad company as customarily kept the gross revenue from the local traffic wholly within the state. As to interstate traffic moving in a particular state, the proportion of revenue which should be credited to it may be fairly determined upon a mileage basis—that is, by allotting the state such part of the revenue as the mileage of haul therein bears to the entire haul. It is said by counsel for defendants that because of the higher range of local rates in Oklahoma that state should be credited with a greater percentage of the interstate revenue than the mileage basis yields. That is but another way of asserting that local rates so directly affect interstate rates and the earnings therefrom that their influence may be

measured and must be regarded by the courts. If that be true, then in every case every reduction by the state authorities of local rates directly and materially affects a subject-matter the regulation of which is vested in Congress. A similar contention was made in the Young Case, 209 U. S. 123, 145, 28 Sup. Ct. 441, 448 (52 L. Ed. 714, 13 L. R. A. [N. S.] 932), and Mr. Justice Peckham, speaking for the court, said: "The question is not, at any rate, frivolous." But the premise of defendants' contention is not altogether true, for the local rates which are the subject of the present controversy are certainly not as a body higher than the like rates in other states concerned in the movement of Oklahoma interstate commerce, and there is not such a showing as to the others as would enable a court to act intelligently were it practicable under any circumstances.

Having the total value of the railroad property in the state, the gross revenue from all operations therein, the gross revenue from each class of business, interstate and local freight and passenger, and mail, express, and miscellaneous, and the proportionate property values devoted thereto respectively, there must then be ascertained the net revenues from the local freight and passenger business so that their relation to the value of the property employed in producing them may be disclosed and the ultimate question answered, to wit, whether the rates from which the net revenues come are reasonably compensatory. At this point arises the principal controversy. A substantial part of the expense of railroad operation is incurred indiscriminately in all its business. For example, the maintenance of way and structures in a state, which makes one of the most important general expense accounts, is almost entirely for the common benefit of all traffic, interstate and local, freight and passenger. As between freight and passenger traffic a large part of the expenses may be directly located and distributed, and it is the custom to apportion the remainder by various rules not necessary to mention here; but generally speaking it is impracticable in railroad business to separate expenses into the interstate and local and the minor and incidental operations. From the very nature of the case, therefore, some rule must be adopted for charging to each of them their fair and equitable proportion of the common expense. Of necessity it must proceed upon average conditions commonly known or shown to exist, and it argues nothing to say that it does not fully apply to this or that exceptional instance. A general rule based on experienced observation is fair, and what is lost by its application in one place is doubtless gained in another, and an equitable equilibrium maintained. Of those suggested the revenue basis appears to be much more uniform in its adaptibility and much less subject to substantial objection. It has been frequently employed. Ames v. Union Pacific (C. C.) 64 Fed. 165; Smyth v. Ames, 169 U. S. 466, 18 Sup. Ct. 418, 42 L. Ed. 819; C., M. & St. P. R. Co. v. Tompkins, 176 U. S. 167, 20 Sup. Ct. 336, 44 L. Ed. 417; Northern Pacific v. Keyes (C. C.) 91 Fed. 47; In re Arkansas R. Rates (C. C.) 163 Fed. 141; St. Louis & S. F. R. Co. v. Hadley (C. C.) 168 Fed. 317. It is the one to which the mind naturally turns in every problem involving the charging of common expense to different departments of a business. When a general or common expense cannot be located,

what is more obviously reasonable than to say in the first place the different branches or departments shall bear it according to the value of their products or their gross earnings, and then make due allowance for exceptional conditions if any are perceived? That seems at the start to satisfy the mind intent on equity. It is a working basis for the distribution of all expense incident to a railroad business among its revenue yielding operations of every character. On the other hand, the ton-mile rule for which contention is made can be applied to nothing but the freight business. Besides being entirely useless as a distributor of expense to the mail and express business of a railroad and to the services of switching, demurrage, storage and the like, the ton-mile rule is radically inaccurate when applied to the very business to which it is best adapted. It does not consider the differences and risks in the character of the freight transported, whether glassware or sand, furniture or coal; whether the freight is moved in car load or less than car load lots; whether the haul is long or short; the character of the traffic as regards time consumed in transportation and occupation of the track and equipment; the number of expensive handlings at terminals and terminal expense generally. The ton-mile theory places interstate traffic while it is moving in the state upon the basis of local traffic, and therefore ignores the effect of the external haul upon the internal cost. Concededly the average of haul of interstate traffic is materially greater than that of traffic wholly within the state, and it is an axiom in transportation that the longer the haul the less the cost per ton per mile. These matters in the aggregate run enormously into the cost of freight transportation, but none of them are picked up or accounted for by the ton-mile rule which rests on the erroneous assumption that the transportation costs the same per ton per mile regardless of character, time, distance, or circumstance. The revenue rule is not ideal, but revenue is the product of rates and service, and, generally, in the making of rates some regard is had to the cost of service. In other words, earnings reflect to some extent the important differences in the cost of service which the ton-mile rule entirely ignores.

Bearing on the division of expense is the much controverted question of extra cost of the local business as compared with the interstate. That the former costs much more than the latter is beyond doubt, but the difficulty is in applying the measure of difference. There is a general accord among practical railroad men of high standing and long experience that the cost of local freight traffic is from 2 to 8 times as much as that of interstate traffic, and of local passenger traffic from 25 to 50 per cent. more than the other. Though not altogether clear from the proofs here, it is probable the difference mentioned in the freight traffic should not be fully applied in addition to a division on the revenue basis, for, as already seen, the difference finds expression in a measure in the relative revenue proportions themselves. A cogent reason for selecting the revenue basis in preference to the ton-mile is that the former gives some effect to the known differences in cost. Nor is it altogether clear that the above ratio of extra cost of local freight traffic was intended by the witnesses to apply to all op-

erating expenses as classified by the Interstate Commerce Commission and the Corporation Commission of Oklahoma. In Southern Pacific Co. v. Bartine (C. C.) 170 Fed. 725, the ratio of extra cost was confined to transportation expenses as distinguished from maintenance of way and structures, maintenance of equipment, and traffic and general expenses. But substantial factors of extra cost of local traffic may be found in other general accounts; for example, in the large cost of maintenance of yard tracks and sidings at terminals which is charged not as a transportation expense, but to maintenance of way and structures. Those tracks sometimes constitute a fifth of the total mileage of a railroad.

The criticism of the formula for apportioning extra cost mentioned in the Arkansas case (C. C.) 163 Fed. 141, is due to a misconception. It appears the evidence in that case showed that on a revenue basis the cost of local freight traffic was double that of the interstate. The court gave a quick abstract rule for ascertaining the local cost, which, if applied to the facts there, would have been to double the local revenue, add it to the interstate revenue, ascertain what proportion the doubled amount bore to the total sum and then take that proportion of the total cost of both. Although every algebraic or mathematical formula applied to the particular facts before that court would have brought the same result, it is earnestly argued here that if a given body of rates are confiscatory they must, under the rule of the Arkansas case, still be confiscatory though the revenue were doubled by doubling the rates —that confiscation would follow, however high the rates and great the revenue. Obviously, if revenue is doubled solely by increasing local rates there would be little, if any, increase in gross cost; if revenue is doubled by increase in volume of local traffic without changing rates the gross cost would probably increase, but not proportionately. But no such construction as contended for can be put upon the language of the court. If the formula given is to be applied to shifting conditions there should be a corresponding change in the numerical factors. This is obvious from a cursory reading of the opinion. A change in the amount of local revenue from whatever cause, rates or volume of traffic, would affect the relative cost predicated on the revenue basis, but whenever the ratio is found the apportionment can readily be made by employing it in the way indicated in the Arkansas case.

The evidence here shows that, regarding average conditions and not exceptional instances, there is a substantial difference between interstate and local traffic in the ratio of cost to revenue. Particularly is this so as to freight. In other words, the apportionment of expense on a revenue basis does not adequately express the difference between them. It is not necessary to determine it definitely in view of the value of the property of the companies and the statement that because of exceptional circumstances the Atchison, Topeka & Santa Fé and the Gulf, Colorado & Santa Fé roads should be considered together. The proofs justify the conclusion that the values of the roads in Oklahoma are at least:

Missouri, Kansas & Texas...................................... $35,185,089
Atchison, Topeka & Santa Fé.................................... 41,877,391
Gulf, Colorado & Santa Fé..................................... 6,406,607

They were assessed for taxation by the State Board of Equalization at 75 per cent. of those sums. The year ending June 30, 1909, is the fairest of the periods available for illustrating the effect of the contested rates upon the net earnings of the companies. It is furthest removed from the depression of 1907. In each case the railroad value, the gross earnings from each kind of business in Oklahoma, and the gross expenses of all are found, the two latter with little question. Applying the foregoing rules and setting off to the local freight business its assignable proportion of value of the railroad employed therein and deducting from the gross local freight earnings the apportioned expense, but without any allowance whatever for the extra cost of local freight traffic as compared with the interstate save to the extent it may be reflected in the different rates and therefore in the revenues, and also without allowance for interest on bonds or dividends on stock, the following result appears: The Missouri, Kansas & Texas earned slightly less than $5\frac{1}{2}$ per cent. for the year, and the Atchison, Topeka & Santa Fé and the Gulf, Colorado & Santa Fé combined $2^9/10$ per cent. If the Atchison and the Gulf roads were to be considered separately, the per cent. of net earnings to assigned value of the former on local freight traffic without allowance for the extra cost or interest or dividends would be $2\frac{1}{2}$ per cent., and that of the latter $7^9/10$. The percentage of net return to each company from its local passenger business was substantially less than that from the freight. These results are foreshadowed by a comparison of the entire values in the state with the entire net earnings. For the year mentioned the net earnings from all operations in Oklahoma, of every character, interstate and local, freight, passenger, mail, express, car service, etc., with no deduction for interest or dividends were:

The Missouri, Kansas & Texas.................................. $1,878,589
The Atchison and the Gulf..................................... 1,519,556

However, the importance of the difference in cost should not be underestimated. For illustration, if, during the period in question, it cost the Missouri, Kansas & Texas Company to earn a dollar of local freight revenue but 10 per cent. more than to earn a like amount of interstate freight revenue, it received a net return of but $4\frac{1}{3}$ per cent. upon nearly $3,000,000 worth of property employed in that business; if the extra cost was 25 per cent., the net return was $2\frac{2}{3}$ per cent.; if the extra cost was 50 per cent., there was a net return of less than $1/10$ of 1 per cent.—and in each case without deduction for interest on bonds or dividends on stock. Rates should be just both to the public and the owner of the railroad. Smyth v. Ames, 169 U. S. 466, 544, 18 Sup. Ct. 418, 42 L. Ed. 819. It does not appear in these cases that the roads were ill conceived, greater in extent than they should be, unduly expensive in construction, or that they are not operated wisely and economically. It therefore does not seem that rates producing no more than a reasonable return on their fair value could be unjust to any one. In fixing the measure of return upon property devoted to public use regard should be had to the character of the business, the locality and the risk; whether the return will be uniform and secure; whether the patronage is steady or fluctuating and

quickly responsive to financial and commercial changes; interest rates legal and contractual and the rates customarily sought and required in like investments in the locality; if a railroad, the character of the traffic, whether largely of a kind dependent upon uncertain conditions, or so diversified that causes affecting part will not greatly affect the whole. The return should be a fair, just, and reasonable one, and not so meager as to repel investment in the property or to embarrass the owner in operating it. In Willcox v. Consolidated Gas Co., 212 U. S. 19, 29 Sup. Ct. 192, 53 L. Ed. 382, the business was that of a gas company in New York City where interest rates are generally the lowest. It dealt in one of the necessaries of urban life. The Supreme Court observed that the risk was reduced almost to a minimum; that the company had a monopoly of the gas service in the largest city in America, secure from competition, and said:

"Taking all facts into consideration, we concur with the court below on this question, and think complainant is entitled to 6 per cent. on the fair value of its property devoted to the public use."

In a preliminary announcement of the conclusion of the court Mr. Justice Peckham said:

"There is no rule as to any particular rate which any corporation subject to legislative control in the matter has a right to obtain without legislative interference. It depends upon circumstances and locality."

The present needs of the cases in hand require no further expression than that the returns to the railroad companies shown by the proofs are clearly deficient.

The demurrers: It is argued that the freight and passenger rates are still in legislative process, and therefore within the doctrine of Prentis v. Atlantic Coast Line, 211 U. S. 210, 29 Sup. Ct. 67, 53 L. Ed. 150, not properly the subject of judicial consideration. Both phases of this contention have already been considered in connection with the pleas. 174 Fed. 59. It is the law of the land that a state may not confine to its own courts a citizen who claims his rights under the Constitution of the United States have been denied. And the Supreme Court did not hold in the Prentis Case that a similar result could be accomplished by prescribing and enforcing under penalties a legislative rule, even though tentative, and restricting the remedy of the citizen to subsequent legislative inquiry and action.

It is also urged that the bills of complaint are defective because they do not assail the freight rates separately. But the bills disclose the contrary, at least by express general allegations. Moreover, the rates in question should properly be considered as a body and in connection with the other freight rates of the companies not affected by the orders. Though the orders, save three modifications, were made successively, at different times during the year 1908, the rates prescribed constitute as much a single body as if embraced in one order. They affect from 40 to 50 per cent. of the local freight business, and cause an average reduction of about 40 per cent. of the prior rates applied to the same amount of traffic. Presumably the Commission preserved a due relation among them so far as is practicable in such cases, and there is no contention that the rates left untouched are relatively

as low. When all the local freight earnings are considered an insufficient net return is clearly disclosed, and there is no difficulty in locating the cause.

Upon the proofs temporary injunctions should be granted. Provisions are made in the orders for the keeping of accounts and the giving of bonds safeguarding, so far as practicable, the patrons of the roads if it should ultimately be determined the enforcement of the rates should not have been suspended.