## CUMBERLAND TELEPHONE & TELEGRAPH CO. v. · RAILROAD AND PUBLIC UTILITIES COMMISSION OF ТENNESSEE et al.

(District Court, M. D. Tennessee, Nashville Division. September 23, 1921.)

No. 87.

**1. Public service commissions ☞7—Approval of changes in rates.**

Under Pub. Acts Tenn. 1919, c. 49, § 5 (d), whenever a public utility increases its rates, such increase may be suspended by the commission for a hearing and determination of its reasonableness, and if, upon such hearing and determination, such increase is approved by the commission it becomes effective, if disapproved, ineffective; but if the commission fails either to suspend such increase, or to hear and determine as to its reasonableness within the times prescribed, such increase thereupon becomes effective, subject, however, to the right of the commission at any time to prescribe reasonable rates after notice and hearing as provided by section 4 (c).

**2. .Public service commissions ☞7—Approval of part of increasei sought.**

Under Pub. Acts Tenn. 1919, c. 49, the determination by the Public Utilities Commission as to the reasonableness of an increase in rates involves not merely an approval or disapproval in its entirety, but the exent, if any, to which it may be approved.

**3. Public service commissions ☞19(1)—Suspension of rates suspends intermediate increase.**

Under Pub. Acts Tenn. 1919, c. 49, the suspension of increased rates by the Public Utilities Commission pending the hearing and determination suspends every intermediate increase involved therein, and requires the utility meanwhile to keep the previous rate in force, even without any express order of the commission to that effect.

**4. Public service commissions ☞7—Suspension of increase of rates;ꞌ "upon."**

The word "upon," in Pub. Acts Tenn. .1919, c. 49, § 5 (d), appearing in the phrase "upon such hearing and determination" in the third sentence, is used in the sense of "pending," and when any public utility increases its rates, the commission may, either on written complaint or its own initiative, hear and determine whether such increase is just and reasonable, and pending such hearing and determination the commission may suspend such increase for not exceeding three months, and if its investigation cannot be completed within such three months, may extend such extension for such further time as will reasonably enable it to complete its investigation.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, On—Upon.]

**5. Public service commissions ☞7—Suspension on notice of increased rates.**

Under Pub. Acts Tenn. 1919, c. 49, § 5 (d), when a public utility gives notice of increased rates to become effective thirty days thereafter, such rates will become effective at the expiration of such 30 days,· unless the commission meanwhile shall have suspended such increase pending a hearing and determination, for not exceeding three months after their effective date, and they will thereafter become effective at the expiration of such suspension, unless the commission meanwhile has commenced its investigation, and, finding that such investigation cannot be completed within such time, has extended the suspension for such further time as will reasonably enable it to complete the investigation.

**6. Public service commissions ☞2—Validity of act as to suspension of increase of rates.**

Pub. Acts Tenn. 1919, c. 49, § 5 (d), permitting Public Utilities Commission to suspend increase of rates pending investigation is valid.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

7. **Public service commissions** ⊙⟹19(1)—**Order suspending rates pending investigation held in part valid.**

Under Pub. Acts Tenn. 1919, c. 49, § 5 (d), an order of the Public Utilities Commission, suspending increased rates for an indefinite period until the commission should determine the matter, was invalid in so far as it suspended the rates for an indefinite period that might continue more than three months after the effective date of the increased rates, but was valid in so far as it suspended the increased rates for such three months period.

8. **Public service commissions** ⊙⟹11—**Public utility not required to pay expense of appraisal.**

The Public Utilities Commission of Tennessee cannot require a public utility to pay the expense of appraisal and audit on application for increased rates, under Pub. Acts Tenn. 1919, c. 49, § 4 (b), in view of Pub. Acts Tenn. 1921, c. 107, § 6.

9. **Public service commissions** ⊙⟹21—**Order suspending increased rates not interfered with by injunction.**

Where existing rates claimed by a public utility to be confiscatory have not been imposed on it by any act of the Public Utilities Commission of Tennessee, but were voluntarily established by the utility itself with the approval of the commission, and the utility gives notice of an increase in rates, enforcement of an order of the commission suspending the increased rate pending a reasonable period of investigation will not be enjoined, on the ground that the existing rates are confiscatory.

In Equity. Bill by the Cumberland Telephone & Telegraph Co., a Kentucky corporation, against the Railroad and Public Utilities Commission of Tennessee, its members and attorneys, to enjoin the enforcement of orders of the Commission in reference to the maintenance of the plaintiff's existing rates for local telephone exchange service in Tennessee and the suspension of increased rates. The City of Memphis and other municipalities intervened as defendants. On application by plaintiff for an interlocutory injunction. Denied.

Keeble & Seay, of Nashville, Tenn., and E. D. Smith, of Atlanta, Ga., Thos. N. Greer, of Shelbyville, Tenn., and Hunt Chipley, of Atlanta, Ga., for plaintiff.

Frank M. Thompson, Atty. Gen., and A. H. Roberts and J. W. Cooper, both of Nashville, Tenn., for defendants Commission et al.

Hughes, Hatcher & Hughes, of Columbia, Tenn., and J. D. Morton, of Gallatin, Tenn., for intervening municipalities.

SANFORD, District Judge. The Cumberland Telephone & Telegraph Company has applied for an interlocutory injunction temporarily restraining the enforcement of certain orders of the Railroad and Public Utilities Commission of Tennessee, requiring the Company to maintain for the present its existing rates for local exchange service in Tennessee and suspending the increased rates for such service which it has sought to put into effect. There is the requisite diversity of citizenship and amount in controversy to give Federal jurisdiction, independently of the Constitutional questions involved.

The gist of the situation presented is this: The Company's present general rates were promulgated by the Postmaster General on May 1,

⊙⟹For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

1919, while its properties were being operated by the Federal Government. They are about 20 per cent. higher than the rates which had previously been in force. Upon the subsequent return of the properties by the Government, the Company filed its petition with the Commission, setting forth that while these Governmental rates had been shown generally to be inadequate, it was necessary, to determine the effect of the various rates with any degree of certainty, that they be given a further practical trial; and praying that the Commission approve them and authorize the Company to continue them for not less than twelve months after December 1, 1919. This petition was, after a hearing, granted by the Commission, with certain minor exceptions; the company being thereby authorized by the Commission to continue to charge the Governmental rates, with such exceptions, for such one year period.

On May 18, 1921, the Company filed with the Commission a schedule of increased rates, which was subsequently withdrawn, before final hearing thereon; apparently because of non-compliance by the Company with the rules and regulations of the Commission providing that no increased rates should go into effect or be allowed, except in cases of discretionary emergency relief, until after thirty days' notice had been given to the Commission and the public.

On May 31st, the Company again filed with the Commission a schedule of increased rates, substantially the same as that withdrawn, to become effective on July 1st; of which the required public notice was given. This new schedule involved a general increase in rates of about 24 per cent. over the Governmental rates then in force. On this same day the Commission ordered that the operation of these increased rates be suspended until after a hearing set for July 18th, and that no changes be made in the rates during such suspension, unless by its special permission.

At the hearing before the Commission on July 18th, various municipalities, which have, by leave of the court, since intervened as defendants in this cause, appeared as protestants in opposition to the increase in rates. The Company introduced various witnesses as to the unremunerative character of the existing rates and the reasonableness of the increased rates; the right of cross-examination being reserved by the protestants. Certain of the Company's witnesses were requested by the Commissioners to file further exhibits; some of which have been filed with the Commission since the filing of the bill herein and some of which have not yet been filed. At the conclusion of the Company's evidence the protestants, without offering any evidence, moved that an appraisal be made of the Company's property by an appraiser to be appointed by the Commission, and at the expense of the Company; while the Company moved that its increased rates be made effective August 1st, upon its executing bond to refund any excess collected thereunder if it should fail to justify them on final hearing; also offering to consent to the appraisal and contribute $50,000.00 to the expense thereof if its motion should be allowed.

On consideration of these motions the Commission handed down its opinion to the effect that, as had been held by it in earlier cases, the

property of a public utility making application for an increase of rates should first be valued by experts selected by the Commission and a proper rate base established as a prerequisite to the granting of an increase; that the expense of such appraisal should be paid by such utility; and that the Company was not entitled, on a prima facie and ex parte showing, to an order permitting it to inaugurate the increased rates upon a refunding bond, without waiting for such appraisal and a complete investigation of its records and methods of operation. Thereupon the Commission, on July 22d, entered an order sustaining the motion of the protestants and denying the motion of the Company, and ordering: That an investigation into the amounts invested in the property of the Company in Tennessee for which it is entitled to a reasonable return, including an audit of its books and analysis of its revenues, expenses and statistics, be made by one expert to be appointed by the Commission and one by the Company, if it should so elect, said two appraisers to be paid by the Company, with the right to the protestants of appointing a third expert, at their expense, to act with them; that the reasonable cost of such examination and report, except the services of the expert employed by the protestants, be paid by the Company; that the report of the experts be filed within six months after August 1st; that upon such filing the parties might apply for such further relief as might appear reasonable and equitable; and that the previous order suspending the increased rates be continued in force until the further order of the Commission and control of the case retained by it for the purpose of making such further and final orders as the facts might warrant. The Company did not except to this order or move the Commission for further hearing or final determination upon the evidence that it had introduced.

On July 27th the chairman of the Commission appointed an expert, with instructions to appraise the Company's properties in Tennessee as of January 1, 1922; to ascertain the historical cost of its properties, their reproduction cost for five years, and accrued depreciation; to audit its books for the year 1921; and otherwise to carry out general instructions given.

Thereupon the Company notified the Commission that it declined to pay the cost of such appraisal or audit; but that its books and records were available to the Commission for any appraisal, audit or investigation it might make or cause to be made.

It does not appear that the expert appointed by the Commission has as yet undertaken to commence any appraisal or audit, or that any further steps have subsequently been taken before the Commission other than the filing of certain of the exhibits called for, as above recited.

On August 10th the Company filed its bill in this case. In its original bill and amended bills, both of which are verified on oath, it is alleged that the existing rates, promulgated by the Postmaster General and continued under the order of the Commission, are inadequate and do not yield it a reasonable return; that since January 1, 1920, its business has been conducted at an actual loss; that said existing rates are confiscatory and in violation of the Fourteenth Amendment to the

Constitution of the United States; that the effect of the Commission's orders of May 31st and July 22d is to continue said confiscatory rates in effect for an indefinite period; and that the order of July 22d is without authority of law and in violation of said Fourteenth Amendment; and it is prayed that the Commission and the Attorney General of Tennessee be enjoined from attempting to compel it to keep the existing rates in force or prevent it from putting its increased rates into effect until other lawful schedules are established by law, or from taking any steps against it to enforce any penalty for putting the increased rates into effect. The defendants, including the intervening municipalities, have filed answers, likewise verified on oath, denying the confiscatory nature or inadequacy of the existing rates and the reasonableness of the increased rates, asserting the validity of the orders of the Commission, and denying that the Company is entitled to any relief.

The motion for an interlocutory injunction was heard upon the sworn pleadings, offered as affidavits; various other affidavits and counter affidavits; and other documentary evidence, including a transcript of the proceedings before the Commission.

The following provisions of the Tennessee statutes are material in the consideration of the questions presented by the motion. By section 3 of chapter 49 of the Tennessee Acts of 1919 (p. 144) the Commission is given general supervision, regulation of, jurisdiction and control over telephone companies and other public utilities. By section 4 (p. 145), it is given power (a) to investigate, upon its own initiative or written complaint, any matter concerning any public utility; (b) to appraise and value the property of any public utility whenever in its judgment necessary so to do for carrying out any provision of the Act; and (c) after hearing upon notice, to fix just and reasonable rates to be imposed and observed by any public utility, whenever it shall determine any existing rate to be unjust and unreasonable. By section 5 (p. 147) it is provided that:

"(d) When any public utility as herein defined shall increase any existing individual rates, joint rates, tolls, fares, charges or schedules thereof, or change or alter any existing classification, the Commission shall have power either upon written complaint, or upon its own initiative to hear and determine whether the said increase, change or alteration is just and reasonable. The burden of proof to show that the said increase, change or alteration is just and reasonable shall be upon the public utility making the same. The Commission shall have power upon such hearing and determination to order the suspension, not exceeding three months, of said increase, change or alteration until the said Commission shall have approved said increase, change or alteration: Provided, however, that if the investigation cannot be completed within three months the Commission shall have power to extend the period of suspension for such further time as will reasonably enable it to complete its investigation of any such increase, change or alteration. It shall be the duty of the Commission to approve any such increase, change or alteration upon being satisfied after full hearing that the same is just and reasonable."

Section 6 (p. 148) provides that no public utility shall impose or exact any unjust or unreasonable rate for services rendered by it within the State. And section 9 (p. 140) provides for penalties for violation of the Act.

This Act of 1919 was amended by chapter 107 of the Tennessee Acts of 1921. By section 2 (p. 217) it is provided that each public utility subject to the control and jurisdiction of the Commission shall pay an annual fee for the inspection, control and supervision of its business, service and rates; the amount of such fee to be measured by its gross receipts, with minimum and maximum fees of $10.00 and $5,000.00 respectively. And by section 6 (p. 220) it is provided that the Commission—

"be, and the same is hereby empowered to employ such rate experts, engineers, attorneys, accountants, auditors, inspectors, examiners, clerks, agents or other employees and assign to them such duties, as it may deem necessary to enable it to fully perform the duties, and to exercise the powers conferred by law upon the Commission. The compensation of any person employed under the authority of this section, shall be paid by the Commission, and paid from the fund in the 'Public Utility Account,' but not otherwise, and said Commission, shall not have the power, to contract for any services for which payment shall be made in any other way, or manner, by the State, or derived, from any other source than the 'Public Utility Account' herein provided for." * * *

By section 7 (p. 221) it is provided that the State or any party aggrieved by any final finding, order or judgment of the Commission may within sixty days appeal to the Supreme Court of Tennessee, which may award a writ of supersedeas, and may review, affirm, reverse or modify such final finding, order, or judgment, as justice may require, and enter therein such order as may be right and just. And by section 8 (p. 222) it is provided that the Commission may require "bond for the payment of costs" in any complaint, proceeding, contest or controversy instituted before it.

After careful consideration of the arguments and briefs of counsel my conclusions on the material questions presented, are:

[1] 1. Under the Act of 1919 whenever a public utility increases its rates, such increase may be suspended by the Commission for a hearing and determination of its reasonableness, as provided by section 5 (d). If upon such hearing and determination, such increase is approved by the Commission it becomes effective; if disapproved, ineffective. But if the Commission fails either to suspend such increase or to hear and determine as to its reasonableness within the times prescribed by said section, such increase thereupon becomes effective; subject, however, to the right of the Commission at any time thereafter to prescribe reasonable rates after notice and hearing as provided by section 4(c). See City of Dallas v. Telephone Co. (C. C. A. 5th Circ.) 272 Fed. 410, 420.

[2, 3] 2. The determination by the Commission as to the reasonableness of the increase involves not merely an approval or disapproval in its entirety, but the extent, if any, to which it may be approved. Thus, for example, if the proposed increase in the rates be 10 per cent. the Commission may approve it to the extent of a 5 per cent. increase and disapprove it as to the excess. Manifestly it was not contemplated that the Commission should be limited to a disapproval of the entire increase, and the utility required to propose, successively, lesser increases until one is reached of which the Commission approves. Such

burdensome and useless delay was never intended. And since the Commission has before it, in the one proceeding, the entire question of the extent to which the increase may be approved, it necessarily follows that the suspension of the increased rates, pending the hearing and determination, suspends every intermediate increase involved therein and requires the utility meanwhile to keep the previous rate in force, even without any express order of the Commission to that effect; although the authority to make such order is necessarily implied from the power of suspension.

[4] 3. While section 5 (d) of the Act is somewhat inartificially phrased, I am of opinion that the word "upon," appearing in the phrase "upon such hearing and determination" in the third sentence, is used in the sense of "pending"—the word appearing in the corresponding phrases in the Interstate Commerce Act (Comp. St. § 8563 et seq.) and New Jersey Act of 1911 (P. L. p. 374), upon which it is apparently largely framed—and that, construed in its entirety (State v. Temple, 142 Tenn. 466, 220 S. W. 1084) the true meaning of this section, in so far as relates to increased rates, is this:

When any public utility increases its rates, the Commission may, either upon written complaint or its own initiative, hear and determine whether such increase is just and reasonable. Pending such hearing and determination the Commission may suspend such increase for not exceeding three months; and, if its investigation cannot be completed within such three months, may extend such suspension for such further time as will reasonably enable it to complete its investigation. Upon being satisfied, after full hearing, that such increase is just and reasonable, the Commission shall approve it.

The validity of the rules and regulations of the Commission providing that an increased rate shall not go into effect until thirty days notice has been given to the Commission and the public, is not here questioned. And obviously, without some such requirement, the utility might increase its rates and put them into immediate effect before the Commission would have any notice of them or opportunity to suspend them pending a hearing and determination as to their reasonableness, and the provisions of said section be thereby rendered nugatory.

[5] Construing the provisions of section 5 (d) in connection with these rules and regulations, their effect is that, when, as in the instant case, the utility gives notice of increased rates to become effective thirty days thereafter, such rates will become effective at the expiration of such thirty days unless the Commission meanwhile shall have suspended such increase pending a hearing and determination, for not exceeding three months after their effective date; and that they will thereafter become effective at the expiration of such suspension unless the Commission meanwhile has commenced its investigation of the increased rates, and, finding that such investigation cannot be completed within such time has extended the suspension for such further time as will reasonably enable it to complete the investigation.

[6] 4. The Company has not in this proceeding questioned the validity of section 5 (d) of the Act. Nor do I perceive any invalidity in

its provisions as hereinabove construed. In Traction Corporation v. Inhabitants of Trenton (D. C.) 227 Fed. 502, 505, it was held that a provision of the New Jersey Act of 1911, which allowed the Board of Public Utility Commissioners, upon notice by a street railroad that it intended to raise its rates, to suspend such increase, without notice, for not exceeding three months "pending a hearing and determination" as to its reasonableness, merely clothed the Board, to which had been delegated the State's rate-making right, with power to preserve the status quo until there could be a hearing and determination upon the merits, and was within the legislative power and not in violation of the Fourteenth Amendment. Nor does the provision giving the Commission authority to continue the suspension for a reasonable time after the three months period to enable it to complete its investigation, render this section invalid. The other public duties of the Commission may frequently be such that it cannot take up immediately the hearing as to increased rates proposed by a particular utility, or proceed, at once, to their determination, or the nature of the case may frequently be such that it finds that it is reasonably necessary that it have a longer time than three months in which to complete its investigation. And such delay, merely preserving the status quo pending a final determination, is, in my opinion, merely an inevitable incident to the complicated nature of the rate-making process, which may properly be allowed that justice may be done to all concerned, upon a full consideration of the merits; especially where the utility is seeking to increase its rates over those previously charged and presumably adequate. This is similar to the power conferred upon and exercised by the Interstate Commerce Commission, which upon the filing by an interstate carrier of a new rate, may first suspend the same for one hundred and twenty days beyond the time when the rate would otherwise go into effect, pending a hearing as to its propriety, and, thereafter, if the hearing cannot be concluded within that time, may extend the suspension for a further period not exceeding six months. Act of June 18, 1910, c. 309, 36 Stat. 539, 552 (Comp. St. § 8583).

[7] 5. In the present case, while the suspension orders made by the Commission were obviously not phrased in the language of the Act, the real question is whether, nevertheless, they are substantially within its provisions. The first order, made May 31st, thirty days before the effective date of the increased rates, suspended them until after the hearing set for July 18th and provided that no change be made in the rates during such suspension, except by its permission. The effect of this order was to suspend the increased rates for an indefinite period after July 18th, until the Commission should determine the matter and make further order in regard to the rates. But while this order was invalid in so far as it then suspended the increased rates for an indefinite period that might continue more than three months after July 1st the effective date of the increased rates, it was, in my judgment, valid in so far as it suspended the increased rates for such three months period, that is, until October 1st, pending a hearing and determination as to the reasonableness of the rates; this being a suspension which the Commission was authorized to make

under the provisions of the Act. And the fact that it undertook to do more than this does not invalidate its action to the extent that it was authorized under the Act.

Furthermore at the hearing on July 18th the Commission, in effect, suspended the increased rates and continued the existing rates in force until after the coming in of the report of the experts, which was not required to be filed before February 1, 1922. At that time it was authorized, independently of its first order, to suspend the increased rates and keep the existing rates in force, for such further time as might reasonably enable it to complete the investigation which it had commenced. It is true that its order does not in terms recite that this further suspension was reasonably necessary for such purpose. The opinion of the Commission, however, when read in connection with the order, shows that such further suspension was, in its judgment, necessary, because it was unwilling to determine the matter upon the evidence presented by the Company, and believed it a necessary prerequisite to the approval of the increased rates that it should have an appraisal of the Company's property and audit of its books, made by a disinterested expert whom it should appoint, and paid for by the Company, and, further, that the making of such appraisal and audit would require substantially the time allowed. In the light of the evidence now presented, I am not now prepared to say either that the making of such disinterested appraisal and audit is not reasonably necessary or that it would not reasonably take the time allowed. And in any event I cannot say that a reasonable time for the making of such appraisal and audit has now expired.

[8] I cannot, however, agree with the Commission in its opinion that it is entitled to now require that the expense of such appraisal and audit be paid by the company. While section 4 (b) of the Act of 1919 authorizes the Commission to appraise the property of any public utility whenever necessary for carrying out any of the provisions of the Act, section 6 of the Act of 1921 provides that the compensation of any rate expert, engineer, accountant, auditor, inspector, examiner, agent or other employee, whom it may employ to enable it to perform the duties and exercise the powers conferred upon it by law, shall be paid by the Commission, and from the fund in the "Public Utilities Account," but not otherwise. There is now an available unexpended balance in this account of about $14,000.00; which, it is true, would apparently be insufficient to procure a complete and entirely satisfactory appraisal and audit. That the Legislature, however, contemplated that any appraisal made by the Commission would be paid for out of this fund and that the utility should not be required to pay therefor, is indicated by the fact that at the same session of the Legislature in 1921 at which this amendatory Act was passed, there was introduced another bill to amend chapter 49 of the Acts of 1919, providing among other things, that in order to enable the Commission to ascertain the actual value of the property of a public utility upon which rates to be promulgated by the Commission should be based, it should be authorized, whenever it deemed necessary, to employ a competent or expert person or persons to make a full and complete survey of the properties

of such utility to ascertain its actual value; the expense of such investigation and survey to be paid by such utility upon order of the Commission. This bill, however, only passed a second reading in the House and was never enacted as a law; while on the other hand the Legislature enacted section 6 of the Act of 1921 specifically provided that the compensation of any accountant, auditor, examiner or other agent employed by the Commission should be paid out of the "Public Utility Account," and *not otherwise*.

Manifestly this question is not controlled by the practice of other State Commissions under statutes containing different provisions. Neither, in my opinion, is the Commission authorized to make this requirement of a public utility as a condition precedent to passing upon an increased rate which it proposes, upon the theory that such utility may thereafter be recouped for such expense by an increased allowance in its rates which will gradually absorb this expense and transfer the burden of its payment to the public. Such expense, however, does not enter into the value of the property of the utility, and is not an element, which, under the authorities, enters into the consideration of a reasonable rate. And, as the Tennessee Act in effect requires the expense of any appraisal made by the Commission to be paid out of the "Public Utility Account," and not otherwise, there appears to be no authority in the Commission for placing this expense either upon the utility itself or upon the public. Nor does it appear that the Commission is authorized, upon approving the proposed rates, to make them effective, retroactively, or that the utility would be authorized to collect the increased rates from users of its service pending the period of suspension; nor, if it should finally appear that the proposed rates were entirely reasonable in themselves and should be approved, that the Commission could allow a still higher rate than had been proposed for the purpose of recouping to the utility the expense of the appraisal. Furthermore, the question now presented is not whether the Commission may, on final hearing, tax the utility with the expense of the appraisal as part of the "costs" of the proceeding—by analogy to the fees and expenses of a special master—in the event the utility fails to justify its increased rates; that question not being now before me or determined in any way.

On the whole I conclude, after careful consideration, that the Commission was not authorized to require the Company to pay the costs of the appraisal and audit as a prerequisite to its determination of the reasonableness of the proposed increase.

It does not follow, however, that the Company is now entitled to the injunction prayed. The time allowed by the Act of 1919 for suspension of the increased rate has not, in my opinion, yet expired, both because the first suspension ordered May 31st is effective until October 1st, and also because the further suspension ordered at the hearing of July 18th, is still effective, it not appearing that a reasonable time has yet expired in which the Commission may complete the investigation of the increased rate which it then commenced.

The situation now presented is not entirely the same as that which appeared at the former hearing on the motion of the defendants, to

dismiss the bill for want of equity. The effect of the averments of the bill was, as I construed it, that the Commission had definitely declined to take further action on the Company's application for increased rates until it should agree to pay the expense of the appraisal and audit. The Commission, however, now states in its sworn answer, generally, that it is proceeding with all possible diligence and dispatch in the discharge of its duty of making a thorough and complete investigation of the increased rates, embracing an appraisal of the Company properties, audit of its books and investigation as to the character of the service and cost thereof, and that it will work out the rights of the parties and establish rates that are just to all persons interested; further, that the first information it had with respect to the Company's attitude toward that part of the order of July 22d which required it to pay the expense of the appraisal was the letter subsequently written to it which has been above referred to; that no petition to rehear was filed and no action of the Commission on the record as it stood sought in any way by the Company, which merely assumed, without making any attempt to ascertain the correctness of its assumption, that the Commission would not take any further steps toward the investigation of the case, and filed its bill accordingly. And with reference to this order of July 22d the Commission specifically states in its answer that while in its opinion the order is in all respects valid and it is the purpose of the Commission to adhere thereto unless the court be of opinion that some portion thereof is invalid, that in the latter event, the Commission "will render faithful obedience to the law as construed by the Court, and will proceed to complete the investigation and fix the rates, under said statute as construed by the court." In view, therefore, of the opinion now expressed by the court, that the portion of the order which required the Company to pay the expense of the appraisal and audit is invalid and without authority of law, I am entirely warranted in the conclusion that the Commission will now, as it states in its answer, and in accordance with the provisions of the law as construed by the court, proceed diligently in the investigation of the increased rates and to a final determination of the reasonableness thereof, without requiring the Company, as a condition precedent, to pay the expense of the appraisal and audit. And this being so, I conclude that the Company is not now entitled to the injunction prayed, either upon the ground that the authorized period of suspension has expired or that final action has been yet taken by the Commission in reference to the increased rates.

[9] 6. The Company, however, earnestly insists that, regardless of the question whether the authorized period of suspension has yet expired, it is now entitled to an injunction restraining the Commission from keeping the existing rates in force pending final determination as to the reasonableness of the proposed increase, upon the ground that the existing rates are confiscatory. Where a State, acting through its rate-making Commission, has, upon its own initiative, made an order reducing the rates of a public utility and putting such reduced rates into immediate effect pending the final completing of the rate-making process, there is strong authority that the utility, upon a show-

ing that such reduced rates are confiscatory, may be granted an injunction, restraining, upon proper refunding bond, the enforcement of such reduced rates pending the continuance of the rate-making process.[1] Love v. Atchison Railway (8th Circ.) 185 Fed. 321, 107 C. C. A. 403 (affirming [C. C.] 174 Fed. 59, and [C. C.] 177 Fed. 493); Landon v. Utilities Commission (D. C.) 242 Fed. 658, 667. And see Oklahoma Operating Co. v. Love, 252 U. S. 331, 40 Sup. Ct. 338, 64 L. Ed. 596 and City of Toledo v. Railways & Light Co. (6th Circ.) 259 Fed. 450, 170 C. C. A. 426. Such a situation, however, where the State reduces the former rates of the utility and imposes a new rate upon it pending the completion of its rate-making process, is entirely different from that presented in the instant case, where the existing rates claimed by the Company to be confiscatory have not been imposed upon it by any act of the Commission, but on the contrary, were voluntarily established by the Company itself with the approval of the Commission. And I am of opinion that where the utility seeks an increase in existing rates that it has itself voluntarily established, the State may properly, as hereinabove indicated, provide for the suspension of such increased rates and the incidental maintenance of the existing rates pending a reasonable time allowed for investigation by the Commission as to the reasonableness of the proposed increase, such preservation of the status quo established by the utility itself being merely an incident to the proper exercise by the State, through its Commission, of the rate-making process; and that where such delay is not unreasonable, the utility is not entitled, on the ground that the existing rates which it has thus established are confiscatory, to be granted an injunction the effect of which would permit it to increase the rates thus voluntarily established pending the due and proper exercise of the rate-making process involved in determining whether the proposed increase is reasonable.[2] In other words, there is, in my opinion, an essential distinction between the case where the status quo has been imposed upon the utility by an act of the Commission, from which the utility is seeking relief, and that where the status quo is the result of the utility's own act, which it is seeking itself to change; the preservation of the status quo during a reasonable period of investigation being in such case, in my opinion, entirely within the authority of the State in the exercise of its rate-making process. In such case the maintenance of the existing rates is not due to any act of the State itself, but is merely a necessary incident to the reasonable and proper investigation of the utility's request for increased rates. Otherwise every public utility dissatisfied with the rates which it had itself established, could, immediately upon the preliminary suspension by the Commission of an application for an increase in rates pending a hearing, without waiting for further action by the Commission, come into court, charging that its own previous rates were confiscatory, and require the court, concurrently with action by the

---

[1] This has been since held in Prendergast v. New York Telephone Co., 43 Sup. Ct. 466, 67 L. Ed. ——, decided by the Supreme Court, April 16, 1923.

[2] See Wisconsin-Minnesota Light & Power Co. v. Railroad Commission (D. C., three judges) 267 Fed. 711, 719.

Commission—the only authorized rate-making body—to conduct an investigation to determine not only whether the existing rates were confiscatory, but the extent, if any, to which it might be reasonably permitted to increase its rates pending action by the Commission. This would obviously, to that extent, render nugatory the provisions of the Act allowing a suspension of the proposed increase pending investigation by the Commission.

7. Furthermore, upon consideration of the affidavits upon which this application has been heard, made ex parte and without opportunity for cross examination of the affiants, and in view of the generality of many of the statements therein contained involving in many respects the mere opinion of the affiants in reference, for example, to the proper allocation of the value of the company's properties as between those devoted to domestic telephone service and to interstate service, the apportionment of wages and other expenses as between such services, the proper allowance for depreciation and other matters, and in the light of the counter evidence, likewise very general, as to the increased earnings of other Telephone Companies, the general decrease in wages and cost of materials, and other matters which need not be referred to at this time, I am not now prepared to say that the Company has made, on the whole, such a showing as to the confiscatory nature of its existing rates as would justify me in granting an interlocutory injunction upon that ground. And, even if the confiscatory nature of the present rates had been sufficiently established, the generality of the affidavits as to the increased rates is clearly such that I would be unable to find in the proof, as the matter is now presented, sufficient ground for determining either that the increased rates were reasonable in their entirety or the extent to which they might be reasonably allowed for the purpose of a refunding bond; there being no evidence of a sufficiently definite character to enable me to determine these matters accurately at this time. So that independently of the preliminary questions of law involved, I should not feel justified otherwise in granting the interlocutory injunction now sought in the exercise of the judicial discretion which should control in such cases.

An order will be hence entered denying the application for an interlocutory injunction.